**ORIGINAL**

United States Courts
Southern District of Texas
FILED

OCT 0 6 2005

Michael N. Milby, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | CRIMINAL NO. H-05-78 |
| VS. | § | |
| | § | JUDGE  KEITH P. ELLISON |
| CHRISTOPHER WILLIAMS | § | |

## CHARACTER AND SUPPORT LETTERS
## and VARIOUS DOCUMENTS FOR SENTENCING

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Defendant Christopher Williams, by and through his attorneys of record,

Dick DeGuerin and the law firm of DeGuerin Dickson & Hennessy, and files the attached

Character and Support Letters and Various Documents for Sentencing.

Respectfully submitted,

DeGUERIN DICKSON & HENNESSY

Dick DeGuerin
1018 Preston Ave., 7th Floor
Houston, Texas 77002
Telephone:     713-223-5959
Facsimile:     713-223-9231
State Bar No. 05638000
Federal I.D. No. 6204

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the attached Character and Support Letters
and Various Documents for Sentencing was served on Assistant United States Attorney Martha
Minnis and United States Probation Officer Joanne Lauder, by hand delivery on the 6th day of
October 2005.

Dick DeGuerin

**<u>Character and Support Letters</u>**
**<u>and Various Documents for Sentencing</u>**

*United States of America v. Christopher Williams*
Case No. H-05-CR-78

# I N D E X

1.  Objections to August 19, 2005, Presentence Investigation Report
    Letter to Joanne Lauder, United States Probation
    September 15, 2005

2.  Letter of Acceptance of Responsibility, Handwritten and Typed
    July 25, 2005

3.  Supplemental Letter of Acceptance of Responsibility,
    Handwritten and Typed
    October 6, 2005

4.  Letter Report from Karen A. Lawson, Ph.D., MPH
    December 10, 2004
    Baylor College of Medicine
    Department of Psychiatry and Behavioral Sciences
    One Baylor Plaza
    Houston, Texas 77030

5.  Letter Report from Karen A. Lawson, Ph.D., MPH
    January 4, 2005

6.  Letter Report from Karen A. Lawson, Ph.D., MPH
    September 14, 2005

7.  Support letter from Carol S. Russell (Defendant's Mother)
    Post Office Box 20633
    Wickenburg, Arizona 85358

8.  Support letter from Lisa Hopkins (Defendant's Sister)

9.    Support letter from Virginia Culin Roberts (Defendant's Grandmother)
      10701 N. La Reserve Drive, Apt. 245
      Oro Valley, Arizona 85737

10.   Support letter from Richard W. Russell (Defendant's Step-Father)
      P. O. Box 20633
      Wickenburg, Arizona 85358

11.   Support letter from Stephanie Jan Martin (Defendant's Step-Sister)
      2483 South Scenic Drive
      Salt Lake City, Utah 84109

12.   Support letter from Marcia S. Hayes (Defendant's Aunt)
      1 Pine Street, #2602
      San Francisco, California 94111

13.   Support letter from Jason Boothe (Longtime friend of Defendant)

14.   Support letter from Corey Smith (Close friend of Defendant)

15.   Sex Offender Treatment Program, U. S. Department of Justice
      Federal Bureau of Prisons

16.   *United States of America v. Terry Burton Kimbrough*, 69 F.3 723

DICK DeGUERIN
MATT HENNESSY
NEAL DAVIS
JOHN PARRAS
TODD WARD

LEWIS DICKSON
OF COUNSEL

DeGUERIN DICKSON & HENNESSY
ATTORNEYS AT LAW
SEVENTH FLOOR, THE REPUBLIC BUILDING
1018 PRESTON AVENUE
HOUSTON, TEXAS 77002

**FILE COPY**

AREA CODE 713
TELEPHONE 223-5959
FACSIMILE 223-9231
ddeguerin@aol.com

WEST TEXAS OFFICE
P.O. BOX 1452
MARFA, TX 79843
915-729-3343

September 15, 2005

Ms. Joanne Lauder
United States Probation Officer
U.S. Courthouse & Federal Building
515 Rusk Ave., 2nd Floor
Houston, Texas 77002

RECEIVED

SEP 1 5 2005

U.S. Probation Office
Houston, Texas

Re:     *United States of America v. Christopher Williams*
        Docket No. 4:05CR00078-001

Dear Ms. Lauder:

Please accept the following as our objections to the August 19, 2005, Presentence Investigation Report you prepared in the above captioned matter. Dr. Karen Lawson recently interviewed Mr. Williams and I have attached a copy of her report. (See "Exhibit A"). If the PSR is amended, I reserve the right to make additional objections upon receiving an additional PSR.

1.     ¶ 5          Defendant objects to the description of events because they are not relevant to his guilty plea for the possession and receipt of child pornography and represent separate and unresolved state charges.

2.     ¶ 17         Defendant objects to the two level increase under USSG 2G2.2(b)(1). Defendant received and possessed images of child pornography, but he did not **knowingly** receive images involving prepubescent minors under the age of 12. Pursuant to *U.S. v. Kimbrough*, 69 F.3d 723, 734 (5th Cir.1995), Section 2G2.2(b)(1) has an intent element. Defendant intended to receive sexual images from the Internet. However, the manner in which Defendant obtained images from the Internet prevented Defendant from knowing the exact content of the material until he opened the material up. When Defendant visited sexual websites, he could not preview the material without first obtaining the images on his computer. Once Defendant realized some of the pornography he obtained from the Internet contained images of minors under the age

Objections to PSI
Page 2
September 15, 2005

of 12, Defendant tried to delete the unwanted material and thought that he was successful in deleting this material.

3.      ¶ 18      Defendant objects to the four level increase under USSG 2G2.2(b)(3). Defendant received and possessed images of child pornography, but he did not **knowingly** receive images involving sadistic or masochistic conduct or other depictions of violence. Pursuant to *U.S. v. Kimbrough*, 69 F.3d 723, 734 (5th Cir.1995), Section 2G2.2(b)(3) has an intent element. Defendant intended to receive sexual images from the Internet. However, the manner in which Defendant obtained images from the Internet prevented Defendant from knowing the exact content of the material until he opened the material up. When Defendant visited sexual websites, he could not preview the material without first obtaining the images on his computer. Once Defendant realized some of the pornography he obtained from the Internet contained images of sadistic, masochistic or violent conduct Defendant tried to delete the unwanted material and thought that he was successful in deleting this material.

4.      ¶ 29      Using the correct specific offense characteristics under Section 2G2.2(b), the total offense level is 26 (63-78 months).

5.      ¶¶ 34      Defendant objects to the description of events because they are not
        thru 43   relevant to his guilty plea for the possession and receipt of child pornography and represent separate and unresolved state charges.

6.      ¶ 36      Defendant did not suggest that the alleged complainant touch Defendant's penis.

7.      ¶ 39      Defendant stated to police in his post-arrest statement that he did have three or four nude photographs of his former students. The students took the photographs without Defendant's knowledge. The students asked Defendant to develop the film that contained the photographs. Once Defendant had the film developed he did not return the photographs to the students. Defendant forgot to throw the photographs away.   The photographs were not sexually provocative nude poses and represented teenage immaturity. For example, one photograph depicted a former student exposing his buttocks and another photograph depicted a former student holding a can of nuts or peanuts next to his testicles.

8.      ¶ 45      Defendant's sister, Lisa Hopkins, was recently divorced and her

Objections to PSI
Page 3
September 15, 2005

contact information has changed.  Defendant requests that you contact his sister.  Defendant has attached the current contact information for Ms. Hopkins.  (See "Exhibit B").

9.    ¶ 56    Defendant attended counseling at the age of 14 to cope with his parent's divorce.

10.   ¶ 67    Defendant resigned from the University of Houston because it was discovered that he had used his state-owned computer to obtain adult pornography from the Internet.  Defendant denies that this incident involved child pornography.

11.   ¶ 90    Defendant has been interviewed several times by Dr. Karen Lawson during his pretrial detention. Dr. Lawson is a licensed psychologist and the Director of the Sexual Abuse Treatment Program at the Baylor College of Medicine in Houston, Texas.  Dr. Lawson's professional opinion is that Defendant is very treatable, with favorable prognosis.  Dr. Lawson is familiar with the Sexual Offender Treatment Program (SOTP) at the Federal Correctional Institute in Butner, North Carolina, and she believes that it will greatly reduce Defendant's risk of recidivism.  Defendant has attached a description of the rigorous SOTP. (See "Exhibit C").  Dr. Lawson is also of the opinion that Defendant would not benefit from a lengthy period of incarceration. In consideration of (1) Dr. Lawson's professional opinion, (2) lifetime sex offender registration, (3) providing DNA for a law enforcement database and (4) Defendant's strong family support, Defendant requests that the Court assess a three year period of supervised release as suggested by the applicable guideline instructions.  USSG 5D1.2(a)(2) and 5D1.2(c).

12.   ¶ 92    Christopher Williams is a 32 year old man who has no criminal history record. Mr. Williams moved from Houston and relocated to Las Vegas in part because he realized that he had put himself in a bad situation with several of his students. Mr. Williams did not establish any sexual relationships with the students at his new school in Las Vegas. Mr. Williams wants to participate in the SOTP, as well as any other available treatment programs to address his issues. Mr. Williams obtained and received child pornography, but he did not intend to receive the images of prepubescent minors under the age of 12 or images involving sadistic, masochistic or violent conduct.  The manner in which Mr. Williams obtained sexual images prevented him from knowing the exact content of the material until it

was on his computer. He tried to delete the images of prepubescent minors and bondage but was unsuccessful. Mr. Williams has learned that Internet advertising of innocuous pornography often leads to the inadvertent acquisition of child pornography, including images of prepubescent minors and bondage. Pursuant to *United States v. Booker*, 125 S.Ct. 738 (2005), the U.S. Sentencing Guidelines are now merely advisory. Mr. Williams behavior in this case is the product of his own immaturity, not a criminal disposition, and his behavior is worthy of a downward departure from the recommended length of imprisonment and supervised release.

The following are my objections to the "Sentencing Recommendation" contained in pages numbered 17 through 20.

Defendant objects to the total offense level. It should be 26.

Defendant objects to the referenced pending state charges. They are not relevant to his guilty plea for the possession and receipt of child pornography and represent separate and unresolved charges.

Defendant requests that the Court order him to the Sexual Offender Treatment Program (SOTP) at the Federal Correctional Institute in Butner, North Carolina.

Defendant objects to the recommendation of a 151 month sentence. Dr. Lawson's extensive psychological evaluations of Defendant indicate that he is very treatable, with favorable prognosis. Dr. Lawson believes that Defendant's completion of the rigorous and comprehensive SOTP will greatly reduce his risk of recidivism. A sentence at the low end of the applicable guideline range, 63 to 78 months, is more than adequate punishment for Defendant receiving images of child pornography from the Internet and consequently possessing these images on his computer.

Defendant objects to the recommendation of lifetime supervised release. In consideration of (1) Dr. Lawson's professional opinion, (2) lifetime sex offender registration, (3) providing DNA for a law enforcement database and (4) Defendant's strong family support, Defendant requests that the Court impose a three year period of supervised release and not depart from the applicable guidelines.

Defendant objects to the prohibition against accessing the Internet or possessing Internet capable software unless he obtains in advance written approval from a probation officer while he is on supervised release. This prohibition will prevent Defendant from successfully operating his planned travel brochure business. This prohibition is

Objections to PSI
Page 5
September 15, 2005

unnecessary because a probation officer can simply install an Internet blocking device on Defendant's computer or periodically access Defendant's computer to ensure that he does not view pornography.

Respectfully submitted,

Dick DeGuerin

DD/tw

cc:    AUSA Martha Minnis

September 14, 2005



**BAYLOR
COLLEGE OF
MEDICINE**

Department of Psychiatry
and Behavioral Sciences

One Baylor Plaza
Houston, Texas 77030
TEL: (713) 798-4840
FAX: (713) 798-3138

Karen A. Lawson, Ph.D., M.P.H.
Assistant Professor
Director, Sexual Abuse
Treatment Program

Dick DeGuerin
Attorney at Law
1018 Preston – 7 FL
Houston, TX 77002

RE:  **CHRISTOPHER J. WILLIAMS**

Dear Mr. DeGuerin,

At your request, I have reviewed the Pre-Sentence Investigation report recently prepared for the Honorable Keith P. Ellison, U.S. District Judge by Joanne Lauder, U.S. Probation Officer. I have also re-interviewed Mr. Christopher Williams at the Harris County Jail in order to continue my assessment of him, and specifically to address numerous issues which were documented in the PSI report.

It continues to be my opinion that Mr. Williams is strongly in the need of treatment for his sexual behavior with minors, and use of pornography. While I realize that a sentence of incarceration in a Federal facility may be ordered by Judge Ellison, it is my professional opinion that Mr. Williams is someone who would greatly benefit from treatment, and that a focus on getting him the treatment he needs as opposed to a focus on continued incarceration, is warranted. I recommend that he begin the treatment portion of any incarceration to which he is sentenced, as soon as possible. It is also my opinion that a sentence of lifetime supervision for Mr. Williams is not warranted, which I will address below more specifically.

My evaluation of Mr. Williams led to several conclusions, which I will briefly summarize here. Specifically, I diagnosed Mr. Williams with Pedophilia (Sexually attracted to males; Exclusive type) and after my recent re-interview of him as well as review of the PSI report, I would not change any of the findings, conclusions, or diagnosis. I believe that Mr. Williams is an individual who is socially immature, unassertive, and needy, and that these characteristics in large part played a role in his sexually inappropriate behaviors, as opposed to being someone who has preyed upon children anywhere and everywhere that he could. His inappropriate behaviors have been limited to individuals with whom he became involved socially, and whom he looked to for validation, acceptance, and attention. In my opinion, his pornography use stems from his social inadequacy, which includes being uncertain about his sexual orientation, seeking out sexual pleasure from a source such as the Internet, as opposed to a more appropriate source such as a same-age partner, and a sexual attraction to pictures of teenage males. Poor boundaries and thinking errors, which are common in circumstances such as these, contributed to Mr. Williams continuing in the behaviors.

While Mr. Williams admittedly has numerous problems, and while he has engaged in unlawful and hurtful behavior, there are many factors which are extremely favorable, and which suggest that his prognosis for change is good. Specifically, Mr. Williams accepts responsibility and has not denied, downplayed or minimized his actions. He expresses remorse and regret, over harm done to his victims and all of the families he knew at Holy Spirit, over how he has hurt his family, and how he has so negatively affected his own life and career. Mr. Williams has tremendous family support, which will help greatly through his process of rehabilitation. Additionally, throughout my evaluation of him, Mr. Williams has recognized his inappropriate social patterns, and realizes the need for improved social age-appropriate relationships.



Exhibit

**Williams, Christopher J.**
**Letter – Page 2**

Other factors which suggest a favorable prognosis with treatment are that there is no report of other types of paraphilias which are ongoing (problematic sexual behaviors which he may be engaging in), and his use of pornography involving underage males, by his report, began in 2001. Compared to other sexual offenders, who often document a lifelong history of various paraphilias and inappropriate pornography use, this history is not extremely long-standing. Another favorable characteristic is that Mr. Williams does not have any diagnosable personality disorder (such as antisocial, narcissistic, or borderline personality disorder) or any other mental health conditions, which are generally hard to effectively treat. He also does not report any history of alcohol or substance abuse. In summary, given the above positive factors, together with Mr. Williams' acceptance of responsibility and motivation for change, treatment would be extremely helpful and likely effective.

I do not believe that Mr. Williams is in need of lifetime supervision. As stated above, if one looks at Mr. Williams' history and the pattern of sexual abuse he evidenced, there is an absence of "predatory" behaviors, such as long-standing pattern of seeking out children for purposes of sexual molestation. While he acknowledges having engaged in sexual behaviors with males from the school where he taught, this began following ongoing contact with the males, which included over-involvement with their families, involvement in "locker room talk", and misconstruing his role as a teacher into a role of being a "friend" to them. Mr. Williams' thinking errors contributed to him crossing boundaries, which he now realizes. In addition, Mr. Williams does not have a history of any other past criminal behavior, suggesting that he does not represent any type of general risk to society. While lifetime supervision would be at considerable cost and effort, Mr. Williams is someone who previously was completely law abiding, and clearly does not need such long-standing supervision. Moreover, he would still need to register as a sex offender, which would serve as a means to keep track of him. It is my opinion that following completion of any sentence and treatment for his sexual offense, he would be at extremely low risk of reoffending. As stated, he has no prior arrests nor problems with the law aside from sexual offending.

Finally, as stated above, it is my opinion that Mr. Williams would be able to benefit greatly from treatment. His behaviors have led to great shame, remorse, regret, and disgust with himself. It is my opinion that he now recognizes his behavior was inappropriate, and I believe he is motivated for change. I have worked with sexual offenders for over 18 years, and I believe that Mr. Williams is in a category of individuals who will benefit from treatment, make change in their life, and do all that they can to prevent any further behavior of this type from happening again. While he himself recognizes that incarceration may in fact be part of his sentence, he is motivated for treatment and for making change in his life.

I strongly recommend that Mr. Williams be considered for treatment while incarcerated, if he indeed receives a sentence. Thus, ideally Mr. Williams could receive treatment during part or all of his incarceration at a facility set up for the treatment of sexual offenders. The Sexual Offender Treatment Program at the Federal Correctional Institute (FCI) Butner in North Carolina would be an ideal location for Mr. Williams, and hopefully this could receive consideration by Judge Ellison. The director of the program in Butner is Dr. Andres E. Hernandez. I know Dr. Hernandez personally, and have worked with him professionally for several years. He is a knowledgeable, rigorous, and well-respected treatment provider for sexual offenders. I have spoken to Dr. Hernandez regarding Mr. Williams' potential acceptance into this program. Based on the admission criteria outlined by Dr. Hernandez, Mr. Williams

Williams, Christopher J.
Letter – Page 3

would be an appropriate candidate for treatment there. He would be eligible for acceptance into the program as of the final 18 months of a federal sentence. According to Dr. Hernandez, a judicial recommendation for placement at this facility is extremely helpful, to expedite his placement there. If a bed is not available, he would immediately be put on a waiting list for placement. For any questions regarding the program at the FCI – Butner, or Mr. Williams' suitability for placement there, Dr. Hernandez can be reached directly at 919-575-4541 ext. 3672.

Again, thank you for the opportunity to evaluate Mr. Williams. Do not hesitate to contact me if I can be of further help. I can be reached at 713-798-4840 or 713-798-7547.

Sincerely,

Karen A. Lawson, Ph.D.

Karen A. Lawson, Ph.D., MPH
Licensed Psychologist
Director, Sexual Abuse Treatment Program
Menninger Department of Psychiatry and Behavioral Sciences
Baylor College of Medicine
Houston, Texas 77030

Current Folder: **INBOX**                                               **Sign Out**

Compose   Addresses   Folders   Options   Search   Help                SquirrelMail

---

Message List | Delete                 Previous | Next          Forward | Forward as Attachment | Reply | Reply All

**Subject:** address
**From:** "Hopkins, Lisa K." <lisa.hopkins@hp.com>
**Date:** Wed, August 31, 2005 9:28 am
**To:** toddward@pdq.net
**Priority:** Normal
**Options:** View Full Header | View Printable Version

```
Todd:
I received your voice mail. I recently got divorced and moved to :
6 E. Thymewood Pl
The Woodlands, TX  77382

New home phone:  281-466-2432

Also, just fyi....I did try to call back the probation officer and kept
getting a busy signal...figured I had the wrong number or something and
that she would call back. My old home phone number is not active. Above
is my new home phone number.

Lisa Hopkins
Hewlett-Packard
Vertical Marketing Manager, SMB Americas
281-514-2852

www.hp.com/go/realestate
www.hp.com/go/legal
www.hp.com/go/accounting

As always, please let me know if you prefer not to receive these e-mails
from me.
For more information regarding HP's privacy policy or to obtain contact
information, please see our privacy statement:
<<http://thenew.hp.com/country/us/eng/privacy_intent.html>>"
```

Download this as a file

**Attachments:**

untitled-[2]              **6** k          [ text/html ]            Download | View





**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Institution*

---

*PO Box 1000*
*Butner NC  27509-1000*

## Sex Offender Treatment Program
(2003 revision)

### Description and Philosophy of the Program

The Sex Offender Treatment Program (SOTP) was established in 1990 at the Federal Correctional Institution (FCI) in Butner, North Carolina.  The SOTP is an intensive, voluntary 112-bed residential therapeutic program for male sexual offenders in the Bureau of Prisons.  The program employs a wide range of cognitive-behavioral and relapse prevention techniques to treat and manage sexual offenders.  The primary goal of the SOTP is to help sexual offenders manage their sexual deviance in order to reduce sexual recidivism.  The program adheres to the notion that, while there is probably no permanent cure for paraphilic disorders, criminal sexual behavior can be effectively managed in most cases through competent treatment and intensive supervision.  Similarly, the SOTP adheres to the notion that, while sexually deviant disorders are influenced by biological, social and psychological factors, criminal sexual behavior is largely a volitional act.

The SOTP recognizes that sex offenders enter treatment with varying levels of denial and motivation.  However, in managing limited resources for many sexual offenders in the Bureau of Prisons, the SOTP seeks to provide services to the most motivated and psychologically suitable offenders.  Thus, the SOTP is designed to help individuals who want to help themselves and are committed to permanent behavioral change. The treatment program encourages its participants to change their criminal lifestyle and become honest, responsible and law-abiding citizens with effective self-control skills.  The treatment program is task-based, not time-based.  Progress is measured in terms of completion of treatment goals and maintenance of therapeutic gains.  Length of time in the program, by itself, does not constitute therapeutic progress or accomplishment.  Program participants do not "graduate" from the treatment program because treatment is viewed as a lifelong endeavor which must continue long after offender's release from prison.

### Admission Criteria

The SOTP seeks to select the most motivated, psychologically minded and treatment-appropriate inmates.  The following criteria must be met before the inmate is considered for admission to the program:

1.     The inmate must have been convicted of a sexual crime.  Inmates whose instant offense is not a sexual crime must have a documented history of sexually deviant and abusive behavior.


Exhibit "C"

2.     The inmate must clearly volunteer for participation in the treatment program and demonstrate a commitment to behavioral change.

3.     The inmate must have a maximum of 36 months left on his sentence prior to release to the community, and a minimum of 18 months from the date of arrival to FCI Butner. Barring some exceptions, the treatment program is generally 18 months long and occurs at the end of the inmate's sentence. In cases where the inmate's release date is based on a parole date, the presumptive parole date will be used to determine his eligibility (i.e., 18-36 month from his release).

4.     The inmate does not have a pending charge or detainer which interferes with release to the community. If the detainer or pending charge is relatively minor and likely not to result in a prison term or interfere with the inmate's release to the community, this criterion may be waived by the SOTP Director.

5.     The inmate speaks English, is literate and demonstrates sufficient intellectual ability to participate in psychotherapy. The SOTP is not designed to meet the needs of intellectually challenged inmates. Borderline intellectual functioning and below renders the inmate ineligible to participate.

6.     The inmate is not psychotic and does not suffer from a psychiatric illness which would prevent him from participating in program. He must demonstrate psychological stability and sufficient "ego strength" to endure the therapeutic intensity and rigors of the residential treatment program.

7.     The inmate may be denied admission to the program if there are indications of poor prognosis (e.g., psychopathy, chronic recidivism) or evidence of poor response to treatment in the past.

**The Residential Treatment Program**
The SOTP is currently housed in Maryland Unit, a general population housing unit of FCI Butner. The residential program is not segregated from the general population. Program participants have direct contact with general population inmates, as they use the same dining, educational, medical, recreational, and religious facilities. Historically, inmates in the SOTP have experienced comparatively low levels of threat to personal safety. Generally, they feel comfortable and are able to participate in therapeutic activities without imminent or significant danger to personal safety.

Program participants are expected to work as all general population inmates in the Bureau of Prisons, and encouraged to participate in activities and programs that promote personal growth and development outside of the SOTP (e.g., education, vocational training).

The length of treatment in the program varies depending on the length of the inmate's sentence, the date of referral to the program, the SOTP's waiting list, and date of arrival to FCI Butner.

The length of treatment may be as short at 18 months or as long as 36 months. Generally, admission to the program is granted in the last 18 months of the inmate's prison term. The SOTP is comprised of four essential components: orientation, assessment, treatment, and release planning:

Pre-treatment and Orientation: This component of the program orients the program participant to all aspects of the program and introduces him to the concepts of therapeutic community. Inmates participate in a brief series of orientation sessions about the program, the benefits of treatment, the expectations of staff and the standards of conduct for all program participants. In this phase, inmates attend and begin to participate in community meetings.

Psychosexual Assessment: This component consists of a series of questionnaires, psychological test batteries, and physiological assessment. Partipants are assessed in three domains: intelligence and cognitive functioning, personality and psychopathology, and psychosexual functioning. All participants will undergo plethymograph and polygraph examination.

Treatment: This component of the program is comprised of milieu therapy, psychotherapy in various treatment modalities, and participation in structured psycho-educational programs focusing on management of sexual deviance through skill building. Psychiatric treatment with medications may be considered on an individual basis to address symptom-related concerns. In addition to individually tailored goals, each program participant is expected to acquire and demonstrate:

1. Remorse and guilt for the sexual crime(s) he committed
2. Complete acceptance of responsibility for the sexual crime(s) he committed
3. Recognition of his deviant sexual arousal and sexual offense pattern(s)
4. Control and management of his deviant sexual arousal and behaviors
5. Improvement in his ability to manage negative emotions
6. Genuine empathy for his victim(s)
7. Improvement in his social skills and overall interpersonal functioning
8. Knowledge of relapse prevention skills

Treatment is implemented using the following modalities:

A. Group psychotherapy
Inmates are assigned to groups of approximately eight to ten program participants. Psychotherapy groups meet once or twice per week. Each group is led by doctoral level psychologists, master level therapists or pre-doctoral psychology interns. During group therapy, program participants are encouraged to honestly discuss their sexual offense history, behavioral patterns, thinking errors or cognitive distortions, difficulty empathizing with victims, and other personal issues. Program participants are encouraged to help each other by providing helpful and constructive feedback, support and confrontation.

B.   Individual psychotherapy
     Inmates are assigned to a staff clinician for regular psychotherapy.  The goals of
     individual therapy are to guide the program participant in the process of treatment,
     implement specific cognitive-behavioral treatments and relapse prevention
     techniques, and address other individual concerns or symptoms.

C.   Psychoeducational programs
     Inmates participate in weekly psychoeducational programs presented by the
     treatment staff.  The primary goal of this component of treatment is to develop or
     enhance specific skills required to maintain therapeutic gains and successfully
     achieve lifestyle change.  This component of the program is divided into three
     phases.  Each psychoeducational phase is 19 weeks long.  The entire
     psychoeducational component requires a minimum of 57 weeks to complete.
     SOTP participants receive programs on a variety of relevant subjects such as:

     a.   Relapse prevention
     b.   Communication and problem-solving skills
     c.   Management of stress and negative emotions
     d.   Victim empathy and victim impact
     e.   Management of deviant sexuality
     f.   Intimacy skills training
     g.   Family integration and reunification
     h.   Understanding thinking errors and distortions
     i.   Human sexuality and sexual orientation

D.   Psychoeducational laboratory
     Inmates participate in weekly meetings to collectively discuss and complete
     homework assignments generated in their psychoeducational programs.

E.   Community meetings
     Inmates participate in weekly community meetings designed to promote
     adherence to the standards of conduct and other behavioral norms.  These
     meetings are intended to provide information, allow program participants to
     publicly acknowledge and support one another, and an opportunity for the
     offender to re-affirm his commitment to a crime-free lifestyle.

F.   Discussion groups
     Inmates participate in weekly group discussions focusing on treatment-related
     topics and reading assignments.

G.   Anger Management groups
     Inmates participate in a weekly group to discuss their ongoing struggles and
     accomplishments with anger management.

H.   Release Planning groups
     Inmates approaching their release to the community meet to review and improve
     their relapse prevention plans, and discuss challenges of community reintegration
     and family reunification.

I.   Search of cells
     To promote accountability and personal responsibility, treatment staff routinely
     search the cells of program participants for the presence of contraband and other
     prohibited items.  Violations of BOP policies and the SOTP's Standards of
     Conduct result in disciplinary action and programmatic sanctions.

Release Planning:  This essential component of the program is intended to help program
participants maintain therapeutic gains and successfully achieve re-integration into the
community upon release from prison.  The SOTP staff and Unit Team collaborate to
develop a sound release plan for the program participant that includes appropriate post-
release housing, possible placement in Community Corrections Centers (CCC), as well as
recommendations for employment, community-based treatment, and community
supervision.  Program participants are encouraged to take an active role in planning their
release to the community.  Inmates requesting placement in a half-way house or CCC (for
up to 60 days) upon release from prison need to meet the following criteria at the time of
placement:

     a.   The inmate has successfully completed Phase I, II and III (Orientation,
          Evaluation and Treatment) and has participated in the SOTP for a
          minimum of 18 months

     b.   The inmate's risk of sexual or violent recidivism is judged to be low to
          moderate, and/or his risk of reoffense upon release is judged to be
          manageable with appropriate conditions of supervision and community
          containment

     c.   The inmate has signed a waiver to modify the conditions of community
          supervision with the sentencing court to incorporate all pertinent
          behavioral restrictions and follow-up treatment requirements imposed by
          the SOTP

     d.   The inmate has agreed to participate in an appropriate sex offender
          treatment or aftercare program in the community of re-entry

     e.   The inmate has demonstrated satisfactory institutional adjustment and
          participation in recommended correctional programs

Prior to the program participant's release from prison, the treatment staff prepare a
comprehensive discharge packet.  This packet is sent directly by the treatment staff to the
United States Probation Officer upon the inmate's discharge from the program.  The

discharge report contains risk-contingent recommendations regarding the intensity of community supervision and monitoring and generally address the areas specific to the offender's sexual deviance and risk (e.g., contact with minors, polygraph testing, treatment recommendations, employment restrictions, Internet restrictions, etc.).   The discharge packet is mailed to the USPO at least 30 days prior to the inmate's release or 45 days following him expulsion from the program. Risk prediction is implemented by integrating the scores from actuarial risk assessment instruments with clinical judgment. In compliance with Bureau of Prisons' policies, the sex offenders in the SOTP are referred to community-based sex offender programs upon their release, and they are subject to notification to state or local law enforcement and Sex Offender Registration officials in the district of release.

## The Staff
The treatment staff is comprised of the following individuals:

> A. Hernandez, Psy.D., Program Director
> M. Bourke, Ph.D., Staff Psychologist/Polygraph Examiner
> L. Frazer, Psy.D., Staff Psychologist
> L. Demby, Ph.D., Staff Psychologist
> R. Melin, Psy.D., Staff Psychologist
> L. Baker, M.A., Treatment Specialist
> C. Gallop, M.A., Treatment Specialist/Plethysmograph Examiner
> R. Harmon, M.A., Treatment Specialist
> S. Taylor, B.S., Treatment Specialist/Referral Coordinator
> Pre-doctoral Psychology Interns

The treatment staff work closely with Unit Management staff to coordinate the inmate's program plan while incarcerated at FCI Butner, NC:

L. Sharpe, ACSW, Unit Manager
M. Phillips, Case Manager
P. McGilveary, Counselor

## Standards of Conduct
Inmates in the SOTP are expected to adhere to higher standards of conduct in order to continue their good standing with the program.  This not only requires that program participants comply with all the rules and regulations governing inmate conduct as defined by the Federal Bureau of Prisons, but also adhere to standards of conduct consistent with individuals who are committed to permanent abstinence from deviant sexual behavior and from possessing any materials which could be used for these purposes (e.g., pornography).  Violation of BOP policy and/or SOTP Standards of Conduct or failure to achieve treatment goals may result in programmatic probation or immediate expulsion.  Expulsion from the program may result in institutional transfer and other consequences, as implemented by the inmate's Unit Team.  For more information about the Standards of Conduct, please see the SOTP Consent Form.

Dress Code
All SOTP participants must adhere to FCI Butner's Dress Code at all times. However, between the hours of 7:30 am and 4:00 pm on program days, the following are inappropriate: short pants, white or grey T-shirts, sweat pants, untucked shirts, soiled or unclean clothing, sunglasses, hats or any head gear, except for those worn for religious purposes, towels around neck, trouser leg turned up, radio headphones outside cells or shower shoes. Exceptions will be made when participants are moving to and from recreation areas during off-program hours.

Inappropriate Materials
Program participants must comply with all policies governing inmate conduct as defined by the Federal Bureau of Prisons. In addition to contraband, the following materials are considered inappropriate for program participants to use, posses, or manufacture any type of pornographic or sexually explicit material such as photographs, drawings, and written materials; any photograph or "cut-out" from any publication of a nude or partially nude adult or child; any sexual apparatus or paraphernalia; any publication or photograph depicting physical abuse or sexual violence; any obvious collection of photographs, pictures or drawings depicting any individuals in sexually explicit or suggestive poses or situations; any material that depicts, describes or encourages activities which may lead to violence, sexual crimes, or exploitation; and any other material that is viewed by staff as incongruent with the goals of treatment as defined by treatment staff.

General Rules
In addition to rules outlined by the Maryland Unit Team, program participants are also expected to adhere to the following rules: 1) participants should be fully dressed and well-groomed by 7:30 am on program days; 2) beds must be made by 7:30 am. – on program days, participants are expected to be out of bed after 7:30 am. – if not at their work site or approved institution program, participants are expected to be engaged in SOTP activities, cleaning their rooms, or contributing to the overall sanitation of the Maryland Unit; 3) prison-issued and personal clothing should be clean and in good condition (e.g., no holes or stains); 4) television should be off during program hours – television viewing is allowed as stipulated by the SOTP TV Guidelines posted in Maryland Unit; 5) playing cards, billiards, or other games are prohibited during work or program hours; and 6) telephone use is not allowed during work or program hours.

Visitation Guidelines
All visits with individuals who have not attained the age of 18 will be screened by treatment staff for their appropriateness. Treatment staff may restrict visitation with children if clinically indicated or if the offender is determined to pose a risk of harm to a child.

Confidentiality
Program participants are informed in writing of the limits of confidentiality, as defined by the Bureau of Prisons' Psychology Services Manual. Specifically, program participants are informed that their confidentiality is protected at all times, except in cases where there

is potential harm to self or others, when the security of the correctional institution is threatened, or when there is suspected child abuse. As BOP staff are charged with protecting every inmate's confidentiality as defined by policy, program participants are expected to protect the confidentiality and privacy of other inmates in the program.

**Referral Procedures**

The SOTP receives referrals from United States District Courts and institutions in the Federal Bureau of Prisons. All referrals to the SOTP must be submitted to the Director of the program for review and approval. Review of cases for admission to the SOTP will not be made prior to sentencing. If the inmate is determined to be appropriate for the program, the Director of the program will provide written acceptance to the referring office. Once accepted, the designation or re-designation request will be submitted to the appropriate regional designations administrator for review and action.

1.   *Direct commitment from a United States District Court*:  The Community Corrections Manager (CCM) will review available sentencing documents to determine eligibility. This may require additional contact with the US Probation Officer who completed the Pre-Sentence Investigation (PSI) report. Prior to preparing a "request for designation" (BP-337), the CCM will provide supporting documentation to the SOTP Director, recommending acceptance. If the Director of the SOTP determines that the inmate is eligible for the program, and bed space permits, the Director of the SOTP will prepare written acceptance to the CCM. The CCM will then initiate the request for designation, with comments verifying the SOTP Director's acceptance. If no other case management concerns exist, the respective regional designator will make the designation to "BUT SOTP". For initial commitment, the CCM will fax or mail a copy of the PSI, J&C and the Security and Custody Classification Sentry form indicating "months to release" or projected release date, and information regarding jail credit, pending charges or detainers.

2.   *Re-designation from Institutions of the Federal Bureau of Prisons*:  A referral packet must be submitted from the Unit Team or Chief Psychologist of the sending institution to the Director of the SOTP. A cover memorandum should outline the justification for the referral, with an assurance that the inmate has read a description of the SOTP and has consented to participate in all components of the program. Preliminary telephone contact between the Chief Psychologist at the referring facility and the Director of the SOTP is strongly encouraged to assess the inmate's suitability and eligibility, and to determine if there is available bed space. In addition to the cover memorandum, the referral packet must include the following:

   (i)    a memorandum from the Chief Psychologist (or designee) of the sending institution indicating that the inmate meets the admission criteria of the SOTP, is psychologically suitable for the rigors of sex offender treatment, and has sufficient motivation to complete the requirements of the program. Treatment contraindications should be highlighted and explained.

   (ii)   the Presentence Investigation report and Judgment & Commitment (J & C),

 (iii) copies of previous psychological and psychiatric evaluation and treatment reports

 (iv) a copy of a current progress report by the Case Manager

 (v) other pertinent collateral information (e.g., disciplinary history)

The SOTP Director will prepare a written response to the Chief Psychologist and/or Unit Team at the referring institution. The Unit Team will prepare a re-designation request (Sentry form 409), noting the acceptance into the SOTP. The respective regional designator will re-designate the inmate to "BUT SOTP" if no other case management concerns exist (transfer code 324).

**All inquiries should be directed to the SOTP Director or Designees:**

Andres E. Hernandez, Psy.D.  C.L. Frazer, Psy.D.  Sandria Taylor
(919) 575-4541 ext. 3672   ext. 3658    ext. 3671
(919) 575-2017 facsimile
E-mail: aehernandez@bop.gov

<u>**Removal from the SOTP**</u>
If the inmate declines to participate in the required components of the SOTP, or is determined to be inappropriate for continued placement in the program, he will be expelled from the SOTP and be promptly removed from the treatment unit by the Unit Team. The reason for removal will be documented in the Central File, and the inmate will be referred for return to his "parent facility" as a program failure (transfer code 325).

### *UNITED STATES OF AMERICA VS. CHRISTOPHER WILLIAMS*
Case No. H-05-CR-78

## LETTER OF ACCEPTANCE OF RESPONSIBILITY
(Handwritten original attached)

Monday, July 25, 2005

Dear Judge Ellison:

I fully accept responsibility for my actions in obtaining and viewing a large amount of child pornography from internet websites and therefore possessing it on my computers' hard drives. I did not share it with others and I tried to delete some. I knew it was wrong. I did not appreciate the harm that I was doing to myself and to my family nor did I consider the welfare of any potential victims.

During my incarceration over the last year and a half, I have thought constantly about my poor judgment in the past and the improvements I need to and will make in the future. Abraham Lincoln once said during a particularly difficult moment in his life that he desired to "leave the world a little better for my having lived in it." This has been my beacon since my first day in jail. My unwavering motivation is to create a new legacy for my time on this planet. I owe it to myself. More importantly, I owe it to my family who has given me unconditional, and perhaps undeserved, love and support.

I want to understand my problem and seek help for it. I hope that my sentence will include the Sexual Offender Treatment Program at the Federal Correctional Institute in Butner, North Carolina.

I am fully prepared to face my punishment and the difficult work ahead. All I can ask from this court is mercy and an opportunity to be a contributing member of this world. All I can ask from my family is forgiveness.

Sincerely,

Chris Williams

I fully accept responsibility for my actions in obtaining and viewing a large amount of child pornography from internet websites and therefore possessing it on my computers' hard drives. I did not share it with others and I tried to delete some. I knew it was wrong. I did not appreciate the harm that I was doing to myself and to my family nor did I consider the welfare of any potential victims.

During my incarceration over the last year and a half, I have thought constantly about my poor judgement in the past and the improvements I need to and will make in the future. Abraham Lincoln once said during a particularly difficult moment in his life that he desired to "leave the world a little better for my having lived in it." This has been my beacon since my first day in jail. My unwavering motivation is to create a new legacy for my time on this planet. I owe it to myself. More importantly, I owe it to my family who has given me unconditional, and perhaps undeserved, love and support.

I want to understand my problem and I seek help for it. I hope that my sentence will include the Sexual Offender Treatment Program at the Federal Correctional Institute in Butner, North Carolina.

I am fully prepared to face my punishment and the difficult work ahead. All I can ask from this court is mercy and an opportunity to be a contributing member of this world. All I can ask from my family is forgiveness.

Sincerely,

## *UNITED STATES OF AMERICA VS. CHRISTOPHER WILLIAMS*
Case No. H-05-CR-78

SUPPLEMENTAL LETTER OF ACCEPTANCE OF RESPONSIBILITY
(Handwritten original attached)

Thursday, October 6, 2005

Dear Judge Ellison:

I am writing this letter to explain how I obtained and viewed the child pornography from Internet websites and to clarify my previous Letter of Acceptance of Responsibility.

To locate Internet websites that contained pornographic images of young teenagers, I did Internet searches with words like "teen pornography." These Internet searches produced lists of various websites. There is no way to know exactly what these websites contain unless you open them up. Often a website would not even let me view the contents until I saved the contents onto my computer.

My Internet searches did not always produce the desired teen pornography images. Sometimes I opened up a listed website from my Internet search, using Search.com or Yahoo.com, and I would get images of African wildlife. Other times I would open up a listed website from my Yahoo.com or Search.com search and get pornographic images of prepubescent minors under the age of 12 or pornographic images of sadistic or masochistic conduct. Upon receipt of the unwanted pornographic images, I either tried to delete them or clicked the back arrow to view the previous list of websites from my Internet searches.

I want to make it very clear that I did not want or intend to receive pornographic images of prepubescent minors under the age of 12 or pornographic images of sadistic or masochistic conduct. The process by which I obtained these images prevented me from knowing exactly what I was receiving until I actually opened up the website and viewed the contents.

I fully accept responsibility for intentionally and knowingly receiving and possessing child pornography but I did not intend to receive or possess images of prepubescent minors under the age of 12 or pornographic images of sadistic or masochistic conduct.

Sincerely,


Chris Williams

Thursday, October 6, 2005

Dear Judge Ellison:

I am writing this letter to explain how I obtained and viewed the child pornography from Internet websites and to clarify my previous Letter of Acceptance of Responsibility.

To locate Internet websites that contained pornographic images of young teenagers, I did Internet searches with words like "teen pornography." These Internet searches produced lists of various websites. There is no way to know exactly what these websites contain unless you open them up. Often a website would not even let me view the contents until I saved the contents onto my computer.

My Internet searches did not always produce the desired teen pornography images. Sometimes I opened up a listed website from my Internet search, using Search.com or Yahoo.com, and I would get images of African wildlife. Other times I would open up a listed website from my Yahoo.com or Search.com search and get pornographic images of prepubescent minors under the age of 12 or pornographic images of sadistic or masochistic conduct. Upon receipt of the unwanted pornographic images, I either tried to delete them or clicked the back arrow to view the previous list of websites from my Internet searches.

I want to make it very clear that I did not want or intend to receive pornographic images of prepubescent minors under the age of 12 or pornographic images of sadistic or masochistic conduct. The process by which I obtained these images prevented me from knowing exactly what I was receiving until I actually opened up the website and viewed the contents.

I fully accept responsibility for intentially and knowingly receiving and possessing child pornography but I did not intend to receive or possess images of prepubescent minors under the age of 12 or pornographic images of sadistic or masochistic conduct.

Sincerely,

**Karen A. Lawson, Ph.D., MPH**
**P.O. Box 20243**
December 10, 2004       **Houston, Texas 77225-0243**
**Phone: 832-549-0427**

.

Dick DeGuerin
Attorney at Law
1018 Preston – 7FL
Houston, TX  77002

**RE:    CHRISTOPHER J. WILLIAMS**

Dear Mr. DeGuerin,

At your request, I evaluated Mr. Christopher J. Williams at the Harris County Jail.  I have met with Mr. Williams on several occasions.  I also obtained collateral data from Mr. Williams' mother and sister.  My findings and impressions of Mr. Williams follow.

Mr. Williams is a 32-year-old Caucasian male.  He reported that he was arrested in Las Vegas on December 5, 2003, where he was living at the time.   Following his arrest Mr. Williams was returned to Houston, and has been held in the Harris County Jail since January of 2004.

Of his personal history, Mr. Williams was born on 9/30/72 in Kansas City, Kansas.  He reported that he lived in Kansas City until he was approximately 13, when his parents divorced.  He then moved with his mother from Kansas City to Tucson, Arizona, where his mother had relatives.  He completed high school in Tucson, attended college in Kansas City, and ultimately moved to Houston.  He earned a Bachelor of Science degree in Sports Administration at the University of Houston.  Mr. Williams became employed at Holy Spirit Episcopal School in 1998.  By the time he left Holy Spirit in August of 2003 to accept a job in Las Vegas, he had achieved the position as Director of Athletics and Director of Physical Education.  He was also the Director of Lower School Sports, and was a physical education teacher.  He coached boys' soccer, basketball, and baseball throughout the time he worked at Holy Spirit.

Regarding his upbringing, Mr. Williams reported that he was raised by both parents until their divorce.  He has one older sister.  Mr. Williams reports having a very close relationship with his mother, who is remarried and lives in Wickenburg, Arizona.  He also described a good relationship with his sister, who lives in the greater Houston area.  His father reportedly lives in Albuquerque, New Mexico, but Mr. Williams stated that no one has heard from him in several months.

Mr. Williams denied any prior legal history, including any arrests, legal complaints against him, or other problems with the law.  Regarding drug and alcohol use, Mr. Williams stated that while he has tried alcohol, he "never finished a drink".  He denied ever using drugs.  Mr. Williams denied any history of mental health problems, ever having been on any psychiatric medications, or having been hospitalized for psychiatric reasons.  He reported that when he first moved to Tucson at age 13, he saw a counselor for two to three sessions to talk about problems with his adjustment to their move.  He also attended a group-type counseling experience at school while still in Kansas City, for kids with parents who are divorcing.  He denied any history of suicide attempts.  Mr. Williams reported that he is in good health, and stated that he is not on any medication.

Results of interview data and psychological testing of Mr. Williams yielded a number of impressions and conclusions. Specifically, psychological test results suggested that Mr. Williams is experiencing emotional distress, including symptoms of depression, loneliness, and social alienation. Symptoms of depression included sadness, feelings of guilt, discouragement about the future, and self blame. He also reported less energy, lower ability to concentrate, and decrease in sleep. He considers himself less worthwhile and is experiencing significant feelings of guilt.

A second impression is that Mr. Williams meets diagnostic criteria for Pedophilia, Sexually Attracted to Males; Exclusive Type (i.e., sexual attraction only to children). He acknowledged involvement with underage individuals and interest in pornography involving teen males.

Third, Mr. Williams experiences significant social isolation, feelings of inadequacy, fear of rejection, and poor self-esteem. He reported feeling extremely inadequate around women, and test results support this finding. Pervasive throughout test results were feelings of dislike for himself, being ashamed of his looks, belief that he is too fat, and belief that he is not sexually attractive. Mr. Williams described his upbringing as lonely, in that his mother was frequently away at work, and his father, when present, was disruptive and abusive to the family. Mr. Williams was described by his mother and his sister as someone who always sought out closeness with other families, and that he "craved" this. Although his mother and sister both reported that Mr. Williams had friends, both described him as generally having one friend at a time. These findings suggest that Mr. Williams has had a long history of social isolation, which likely has limited his social skills and adeptness, and has limited the extent to which he has been effective in building meaningful relationships with other individuals his age.

Related to this, Mr. Williams' lack of healthy social adjustment with people of his own age likely led to spending time with younger individuals, with whom he may have felt more comfortable, or more able to "relate". He likely felt more accepted by this age group, and due to his age or status, may have felt looked up to and valued by younger individuals, thus restoring some sense of worthiness. Several examples of his social immaturity were noted, which likely contributed both to his over-involvement with minors, and which prevented him from seeking out relationships with peers of his own age group. Examples of social immaturity included the ongoing social involvement with students, including being someone the students talked to about personal problems and knowing what everyone did over the weekend; the absence of very many friends his own age; and not being in a steady relationship with an adult female. In addition, Mr. Williams acknowledged to this examiner on several occasions, that he wanted to feel needed by the students, and that he "listened to them and helped them". Thus, although he is 32, has completed his education, held steady employment, and was looked up to as an educator, his behaviors suggest that he functioned socially at a younger age.

On the favorable side, numerous positive factors are present, which suggests that prognosis for treatment and change can be very good. Specifically, Mr. Williams verbalized remorse and regret over his behavior. In this examiner's opinion, his remorse was not over the fact "that he got caught", rather, he expressed remorse and regret over his poor choices and problematic behavior. At one point during the interview, he told this examiner that in his role as a teacher at Holy Spirit he was trying to teach these kids to do right and he himself wasn't doing right. Again, it appears that Mr. Williams does view his behavior as problematic, and did not try to minimize or deny when asked specific questions about it. He expressed the desire to make changes, and stated that he saw his move to Las Vegas a step in this direction.

Christopher J. Williams
Page 3

Another factor which is associated with positive treatment outcome is the absence of other paraphilias. Mr. Williams acknowledged pornography use, and given his sexual interest in boys, it is clear that he has some deviant sexual preferences. However, given the range of sexual behaviors that are known, Mr. Williams does not report engaging in other problematic sexual behaviors. Specifically, Mr. Williams denied any history of other sexual behaviors such as rape, exhibitionism, voyeurism, crimes with sexual intent (burglary or theft of items for sexual pleasure), any forms of sexual harassment, or stalking. He denied ever having any interest in cross-dressing, obtaining or using women's clothing, or involvement in any other type of paraphilia such as sadism or masochism, fetishism, transvestitism, or bestiality.

Other factors which are present and which suggest a favorable prognosis are the absence of any type of personality disorder, and absence of problems with alcohol or other substance abuse. In addition, Mr. Williams reported being motivated for change, and recognizes the significant impact his behavior has had on his family, the students at Holy Spirit, their families, and others. During one interview with him in particular, he evidenced sadness, regret, and reflection over what has taken place, and as noted above, verbalized strong remorse. Finally, Mr. Williams has significant family support and resources, a factor which is extremely helpful in assisting him through the process of change.

It is likely that, although Mr. Williams was in a relatively high profile position (school Athletic Director), and was viewed as helpful, outgoing, hard-working, etc., it became very difficult for him to reach out for any resources that could help. His school involvement and perceived position of importance may have contributed to his feelings of loneliness in that he feared revealing this to others. Thus, he maintained a façade of stability and healthy social adjustment, although in reality he was very sad and lonely. It is likely that he found companionship and comfort in relationships with minors, and allowed his feelings of being looked up to by them, as well as his comfort in being around them, to blur his judgement, and the boundaries that he should have been keeping.

Regarding whether Mr. Williams is predatory, he did not engage in any ongoing attempts to single out random individuals to sexually molest. His pattern was not of someone who roamed parks, malls, playgrounds, and other places where children gather. He also did not report using the Internet to engage in conversation with, or to lure minors. Mr. Williams has had access to many hundreds of students on an ongoing basis over the years without other incident, and had received awards and other positive feedback for his dedication to teaching. He also reported that there were no occasions of conducting himself inappropriately during his job in Las Vegas.

Regarding treatment considerations for Mr. Williams, it is this examiner's opinion that numerous factors are present which are extremely favorable. This suggests that a good prognosis is possible if Mr. Williams receives outpatient treatment that is consistent and long term. The following are treatment recommendations that would need to be in place, in order to optimize a positive outcome for Mr. Williams.

First, individual therapy is recommended, to help strengthen personal resources, including improvement of self-esteem, feelings of inadequacy, and social awkwardness. Therapy which is long-term, and which will address underlying issues related to Mr. Williams' emotional functioning, is recommended. Although Mr. Williams did not report an ongoing struggle with depression, and denied any prior treatment for depression, in the current evaluation he did endorse a number of symptoms of depression which warrant addressing in therapy.

**Christopher J. Williams**
**Page 4**

Involvement in group therapy for sexual offenders is also recommended. Involvement in a group that is cognitive-behavioral in the treatment approach, and which utilizes a Relapse Prevention component is necessary. Treatment of this type is long term. Involvement in therapy of this type can also be extremely effective in addressing Mr. Williams' propensity to use pornography. Finally, it is recommended that he become involved in support group for individuals who are sexually preoccupied, such as SAA (Sex Addicts Anonymous) or other type of relevant support group. Such involvement can be extremely useful in order to continue learning strategies to cease problematic sexual behaviors. In addition, for the most favorable treatment outcome to occur, involvement in several different modalities, as outlined above, each of which address somewhat different aspects of a person's functioning, is needed.

Thank you for the opportunity of evaluating Mr. Williams.

Sincerely,

*Karen A. Lawson, Ph.D.*

Karen A. Lawson, Ph.D., MPH
Licensed Psychologist
Director, Sexual Abuse Treatment Program
Menninger Department of Psychiatry and Behavioral Sciences
Baylor College of Medicine

January 4, 2005



**BAYLOR**
**COLLEGE OF**
**MEDICINE**

Department of Psychiatry
and Behavioral Sciences

One Baylor Plaza
Houston, Texas 77030
TEL: (713) 798-4840
FAX: (713) 798-3138

Karen A. Lawson, Ph.D., M.P.H.
Assistant Professor
Director, Sexual Abuse
Treatment Program

Dick DeGuerin
Attorney at Law
1018 Preston – 7FL
Houston, TX  77002

**RE:   CHRISTOPHER J. WILLIAMS**

Dear Mr. DeGuerin,

This letter is in follow-up to our recent conversation regarding my opinion as to the treatability of Mr. Christopher Williams in prison, if he is sentenced.  I would first like to restate that it is my professional opinion that Mr. Williams is very treatable, with a favorable prognosis. This opinion stems from having interviewed Mr. Williams for several hours, having obtained psychological testing on him, and having spoken to two of his family members at length regarding his strengths, personality characteristics and other resources.  My previous letter to you documented my findings and my impression that Mr. Williams could benefit extremely well from treatment.

Regarding your question as to whether Mr. Williams would be treatable following incarceration, it is my opinion that his prognosis would still be favorable if he were to enter treatment following a prison sentence.  It is logical that while a briefer incarceration would be more preferable, in order for outpatient treatment to begin, I believe that Mr. Williams would nonetheless still benefit from treatment at any point following incarceration.

I strongly recommend that Mr. Williams be considered for treatment *while incarcerated*, if he indeed receives a sentence. Thus, ideally Mr. Williams could receive treatment during part or all of his incarceration at a facility set up for the treatment of sexual offenders.  The Sexual Offender Treatment Program at the Federal Correctional Institute (FCI) Butner in North Carolina would be an ideal location for Mr. Williams, and hopefully could receive consideration by Judge Harmon. The director of that program, Dr. Andres E. Hernandez, is someone whom I know personally and have worked with professionally for several years.  He completed his doctoral internship and a post-doctoral fellowship at Baylor College of Medicine in Houston, and is a knowledgeable and well respected treatment provider for sexual offenders.  I have spoken to Dr. Hernandez regarding Mr. Williams' potential acceptance into this program.  Based on the admission criteria outlined by Dr. Hernandez, Mr. Williams would be an appropriate candidate for treatment.  He would be eligible for acceptance into the program at the final 18 months of a federal sentence.  According to Dr. Hernandez, a judicial recommendation for placement at this facility is extremely helpful, to expedite his placement there.  If a bed is not available, he would immediately be put on a waiting list for placement.  For any questions regarding the program at the FCI – Butner, or Mr. Williams' suitability for placement there, Dr. Hernandez can be reached directly at 919-575-4541 ext. 3672.

Christopher J. Williams
Page 2 – Letter

Please do not hesitate to contact me if I can answer other questions, or be of further assistance.  Thank you very much.

Sincerely,

*Karen A. Lawson*

Karen A. Lawson, Ph.D., MPH
Licensed Psychologist
Director, Sexual Abuse Treatment Program
Menninger Department of Psychiatry and Behavioral Sciences
Baylor College of Medicine

September 14, 2005



**BAYLOR COLLEGE OF MEDICINE**

Department of Psychiatry
and Behavioral Sciences

One Baylor Plaza
Houston, Texas 77030
TEL: (713) 798-4840
FAX: (713) 798-3138

Karen A. Lawson, Ph.D., M.P.H.
Assistant Professor
Director, Sexual Abuse
Treatment Program

Dick DeGuerin
Attorney at Law
1018 Preston – 7 FL
Houston, TX 77002

RE:   **CHRISTOPHER J. WILLIAMS**

Dear Mr. DeGuerin,

At your request, I have reviewed the Pre-Sentence Investigation report recently prepared for the Honorable Keith P. Ellison, U.S. District Judge by Joanne Lauder, U.S. Probation Officer. I have also re-interviewed Mr. Christopher Williams at the Harris County Jail in order to continue my assessment of him, and specifically to address numerous issues which were documented in the PSI report.

It continues to be my opinion that Mr. Williams is strongly in the need of treatment for his sexual behavior with minors, and use of pornography. While I realize that a sentence of incarceration in a Federal facility may be ordered by Judge Ellison, it is my professional opinion that Mr. Williams is someone who would greatly benefit from treatment, and that a focus on getting him the treatment he needs as opposed to a focus on continued incarceration, is warranted. I recommend that he begin the treatment portion of any incarceration, to which he is sentenced, as soon as possible. It is also my opinion that a sentence of lifetime supervision for Mr. Williams is not warranted, which I will address below more specifically.

My evaluation of Mr. Williams led to several conclusions, which I will briefly summarize here. Specifically, I diagnosed Mr. Williams with Pedophilia (Sexually attracted to males; Exclusive type) and after my recent re-interview of him as well as review of the PSI report, I would not change any of the findings, conclusions, or diagnosis. I believe that Mr. Williams is an individual who is socially immature, unassertive, and needy, and that these characteristics in large part played a role in his sexually inappropriate behaviors, as opposed to being someone who has preyed upon children anywhere and everywhere that he could. His inappropriate behaviors have been limited to individuals with whom he became involved socially, and whom he looked to for validation, acceptance, and attention. In my opinion, his pornography use stems from his social inadequacy, which includes being uncertain about his sexual orientation, seeking out sexual pleasure from a source such as the Internet, as opposed to a more appropriate source such as a same-age partner, and a sexual attraction to pictures of teenage males. Poor boundaries and thinking errors, which are common in circumstances such as these, contributed to Mr. Williams continuing in the behaviors.

While Mr. Williams admittedly has numerous problems, and while he has engaged in unlawful and hurtful behavior, there are many factors which are extremely favorable, and which suggest that his prognosis for change is good. Specifically, Mr. Williams accepts responsibility and has not denied, downplayed or minimized his actions. He expresses remorse and regret, over harm done to his victims and all of the families he knew at Holy Spirit, over how he has hurt his family, and how he has so negatively affected his own life and career. Mr. Williams has tremendous family support, which will help greatly through his process of rehabilitation. Additionally, throughout my evaluation of him, Mr. Williams has recognized his inappropriate social patterns, and realizes the need for improved social age-appropriate relationships.

Other factors which suggest a favorable prognosis with treatment are that there is no report of other types of paraphilias which are ongoing (problematic sexual behaviors which he may be engaging in), and his use of pornography involving underage males, by his report, began in 2001. Compared to other sexual offenders, who often document a lifelong history of various paraphilias and inappropriate pornography use, this history is not extremely long-standing. Another favorable characteristic is that Mr. Williams does not have any diagnosable personality disorder (such as antisocial, narcissistic, or borderline personality disorder) or any other mental health conditions, which are generally hard to effectively treat. He also does not report any history of alcohol or substance abuse. In summary, given the above positive factors, together with Mr. Williams' acceptance of responsibility and motivation for change, treatment would be extremely helpful and likely effective.

I do not believe that Mr. Williams is in need of lifetime supervision. As stated above, if one looks at Mr. Williams' history and the pattern of sexual abuse he evidenced, there is an absence of "predatory" behaviors, such as long-standing pattern of seeking out children for purposes of sexual molestation. While he acknowledges having engaged in sexual behaviors with males from the school where he taught, this began following ongoing contact with the males, which included over-involvement with their families, involvement in "locker room talk", and misconstruing his role as a teacher into a role of being a "friend" to them. Mr. Williams' thinking errors contributed to him crossing boundaries, which he now realizes. In addition, Mr. Williams does not have a history of any other past criminal behavior, suggesting that he does not represent any type of general risk to society. While lifetime supervision would be at considerable cost and effort, Mr. Williams is someone who previously was completely law abiding, and clearly does not need such long-standing supervision. Moreover, he would still need to register as a sex offender, which would serve as a means to keep track of him. It is my opinion that following completion of any sentence and treatment for his sexual offense, he would be at extremely low risk of reoffending. As stated, he has no prior arrests nor problems with the law aside from sexual offending.

Finally, as stated above, it is my opinion that Mr. Williams would be able to benefit greatly from treatment. His behaviors have led to great shame, remorse, regret, and disgust with himself. It is my opinion that he now recognizes his behavior was inappropriate, and I believe he is motivated for change. I have worked with sexual offenders for over 18 years, and I believe that Mr. Williams is in a category of individuals who will benefit from treatment, make change in their life, and do all that they can to prevent any further behavior of this type from happening again. While he himself recognizes that incarceration may in fact be part of his sentence, he is motivated for treatment and for making change in his life.

I strongly recommend that Mr. Williams be considered for treatment while incarcerated, if he indeed receives a sentence. Thus, ideally Mr. Williams could receive treatment during part or all of his incarceration at a facility set up for the treatment of sexual offenders. The Sexual Offender Treatment Program at the Federal Correctional Institute (FCI) Butner in North Carolina would be an ideal location for Mr. Williams, and hopefully this could receive consideration by Judge Ellison. The director of the program in Butner is Dr. Andres E. Hernandez. I know Dr. Hernandez personally, and have worked with him professionally for several years. He is a knowledgeable, rigorous, and well-respected treatment provider for sexual offenders. I have spoken to Dr. Hernandez regarding Mr. Williams' potential acceptance into this program. Based on the admission criteria outlined by Dr. Hernandez, Mr. Williams

<strong>Williams, Christopher J.<br>Letter – Page 3</strong>

would be an appropriate candidate for treatment there.  He would be eligible for acceptance into the program as of the final 18 months of a federal sentence.  According to Dr. Hernandez, a <u>judicial recommendation</u> for placement at this facility is extremely helpful, to expedite his placement there.  If a bed is not available, he would immediately be put on a waiting list for placement.  For any questions regarding the program at the FCI – Butner, or Mr. Williams' suitability for placement there, Dr. Hernandez can be reached directly at 919-575-4541 ext. 3672.

Again, thank you for the opportunity to evaluate Mr. Williams.  Do not hesitate to contact me if I can be of further help.  I can be reached at 713-798-4840 or 713-798-7547.

Sincerely,

*Karen A. Lawson, Ph.D.*

Karen A. Lawson, Ph.D., MPH
Licensed Psychologist
Director, Sexual Abuse Treatment Program
Menninger Department of Psychiatry and Behavioral Sciences
Baylor College of Medicine
Houston, Texas 77030

# Carol S. Russell

Post Office Box 20633   .   Wickenburg, AZ  85358
928-684-0319

June 9, 2005

To Whom It May Concern:

I am writing to you on behalf of my son, Christopher James Williams, who is charged with and has pled guilty to receipt of child pornography on his computer.

A bit of background about Chris:  You know that he is 32 years old.  He's the second of two children and has a sister who is almost 9 years older than he is.  They have always been very close.  Chris's dad and I were married for 22 years, but it wasn't a happy marriage and it ended in divorce when Chris was about 12 years old.  After the divorce, Chris and I moved from Kansas City where he was born, back to Arizona, where I had grown up and where my family lived.  Chris completed Junior High and High School in Tucson, then went on to college at the University of Kansas, Pima Community College in Tucson, the University of Arizona (where he was a fifth generation student) and finished at the University of Houston with a B.S. degree in kinesiology  and sports administration.  During his time at UH, he worked in the University's Athletic Department and Football Department in several positions of responsibility, including one as Assistant Director of Football Operations. He took a year off of college to work there full time. He also worked several other part-time jobs during his entire college career, including coaching basketball, working for a college human resource department, and waiting tables.

After his graduation, Chris was offered a position at Holy Spirit Episcopal School in Houston, teaching and coaching, where for five years he experienced a high degree of success and earned the respect and affection of fellow teachers, administrators, students and parents.  He was named Teacher of the Year by West Houston Chamber of Commerce in 2002.   After five years at Holy Spirit, because of his qualifications, personal demeanor, outstanding record and recommendations from colleagues at Holy Spirit, he was offered a position at the prestigious Alexander  Dawson School in Las Vegas as athletic director and coach.  Everyone thought he had a brilliant future in a job he loved and had a gift for.

Regarding the charges against Chris, nothing of this nature has ever happened to anyone in Chris's family before.  His family members for generations have been teachers, lawyers, judges, ranchers, career military officers, shopkeepers, nurses, authors, coaches, businessmen, legislators, investment managers, graduate engineers, construction contractors, entrepreneurs, commodity brokers, housewives, technology wizards, and myself, an arts administrator.  All of us in this close family share solid middleclass American values that have been passed down to Chris's generation and beyond.  Until the time of his arrest, Chris had never had a black mark of any kind on his record.

As you might imagine, the last year and one-half since Chris was arrested, charged and jailed have been extremely difficult times for all of Chris's family.  The initial shock and disbelief were overwhelming—not just because we love Chris, but because we couldn't conceive of the reported actions as being anything Chris would do.  Why?  Because it was completely out of

character for the person we knew as son, brother, nephew, cousin, uncle, grandson—not to mention those who knew him as teacher, colleague, friend.

Chris is one of the most wonderful people I know in the world. He is not only a very intelligent, gifted, thinking person and a one of great good humor and fun, he is also a man of great compassion, kindness, warmth, generosity, intellectual curiosity, integrity, and yes, goodness. He's interesting and fun to be with, and often is inspiring and uplifting. He always encourages and supports the best in people he's with. His mission in life since he was very little has been to be a helper, and family has been his highest priority.

We all have our demons, and Chris, for whatever reason, is bedeviled by demons that none of us, including him, would ever ask for. I know that Chris did not want or choose these particular demons—he was simply dealt the cards and had to figure out how to play them.. But I don't believe he knew where to turn to get help in his solitary battle. I believe he realized that he must change his life, and was trying to do so in the only way he knew how when he moved from Houston to Las Vegas to take a new job in the summer of 2003. Then, within months, he was arrested, and he's been in jail since then.

I don't absolve Chris for any of his wrong actions, which were his choices and his responsibility. He has never tried to deny anything, but has stood up and told the truth from the beginning, for that is part of the value system that he lives by. He feels tremendous remorse for his actions and for any emotional injuries he has caused. He will be willing to suffer whatever consequences are required, for that is part of his value system as well.

Chris is not a person who should be thrown away. He needs help, it is true. It is my hope that he can get the help he needs and redeem himself. Certainly his family is standing ready to provide what ever is needed—support of every kind including treatment that will allow his rehabilitation, redemption and return to a life of service. Chris's life has changed. It will never again be an easy one. But he is determined that, if given the chance, he will make amends, dedicate himself to his rehabilitation and to living a life that has a positive effect on the world in some way. His family will not give up on Chris, and I hope the justice system won't either. He is worth saving.

I ask for your consideration and for your wisdom. Please allow Chris to serve the minimum time allowed, to receive treatment while serving time, to build a life in the future where he can serve his fellow man—and make a positive difference in the world. From our many phone conversations and letters in the past year and one half while he's been in jail, I know that this is what he wants to do. I believe he will humbly dedicate himself to doing so if given the opportunity.

Yours sincerely,

Carol S. Russell

July 1, 2005

To Whom It May Concern:

I am writing this letter on behalf of my brother, Christopher J. Williams, whom I've known since his birth, almost 33 years ago.

I'll never forget the day my Mom and Dad brought Chris home from the hospital. I was all of nine years old at the time, but I wanted to "mother" him. Shortly thereafter, one day I decided to show him off to my neighborhood friends. I put him in the stroller, unbeknown to my Mother, and proceeded to walk down the street parading "my" baby! When my mother realized that her two kids were not in the house, she went on a hunt and found me, happy as could be, pushing "my" real live baby down the street. From that moment forward I had an unusually strong bond with Chris and felt responsible for him and took care of him in many ways. Essentially, he ended up with two mother figures that always looked out for him.

It's so hard to think back to that day when I was nine years old, a smile on my face, caring for my brother, that I would feel such a lack of control and impact in his life right now. No one in his family could imagine that Chris would ever face jail time much less even a speeding ticket! It's a humbling feeling as we all learn to deal with things now.

My memories of Chris' childhood are filled with laughter. He mastered the art of using humor to help lighten up the misery that was going on in our household. From the outside, our family looked perfect. My Dad was Vice President for a well respected company in Kansas City. He was recruited from Arizona State University to work there and moved up the ranks rather quickly. Mom, first working as a teacher, then in real estate was always the envy of my friends and their mothers because she had the beauty, intellect and abilities beyond what most people dream of. My mother also entertained a lot for business and pleasure, so on top of all the other qualities she was a great cook. I would venture to guess that anyone who knew us at the time envied our success and character as a family.

What was going on behind closed doors was complete torture! To help illustrate the magnitude of dysfunction, you have to go back almost 40 years. My parents married rather young and my mother graduated from college and supported the family in her teaching job while Dad

1

worked in the military and later finished school. From early on there were signs of serious problems. When I was born in 1963 things got a bit challenging for the two of them due to the added responsibilities and costs of raising a child. At one point things were so bad that my Dad tried to convince my mother to give me up for adoption (I was two years old) because "I" was causing so many problems in the family. That's where the dysfunction reared its ugly head and continued until my parents were finally divorced in 1984 after more than 20 years of marriage.

From the time I was born until 1984 (21 years) when my parents divorced, Chris and I dealt with countless acts of abuse, neglect and sociopathic behaviors – all from my father. My father began molesting me when I was about four years old and it continued until I was about 17 years old. Then there was verbal and physical abuse toward me, Chris and my mother. Chris always tried to calm things down – using humor to try to change the focus of the moment. Sometimes it actually worked so he developed that part of his personality as time went by. Words cannot describe the number of years and number of examples of abuse, neglect, game playing and control my father burdened us with. He became the person we all tried to please which just made his sickness worse. To my knowledge, Chris did not directly witness my molestation, but he's told me of the many times he knew my father was in my room with the door locked. Usually my Dad's molestation pattern started with a serious fight…lots of yelling, name calling (slut, whore, etc.) and moved on from there. Chris stayed in his room which was right next door trying to figure out what to do – thus, a peacemaker was born.

Chris and I both never stopped trying to win our Dad's heart and commitment. Dad continued his sick patterns which over time just seemed to get worse. Kind of like an alcoholic, he had to move on to worse and worse tendencies to continue getting the "love fix" from me and Chris.

Mom and Dad were separated two different times during their marriage. One time was shortly after Chris was born and the other time was when Chris was in late elementary school. The first separation lasted one year and the second for about four years. Dad had a separate apartment so when there was fighting, even if it was Christmas Eve, Dad would leave us. With all the turmoil going on with Mom and Dad, Chris and I grew closer and closer. I spent my summers caring for Chris and as time went by, even when I was married, Chris would escape to my house when things were rough with

2

Dad. Even when Chris was attending college in Houston he lived with me for two years.

Because of our experiences growing up, Chris developed a really strong ability to care for others. We always had to be watching for Dad's moods and feelings so a very intuitive nature developed. One of the good things that came from that experience was Chris' ability to help others. He has remained a very caring person as an adult and ultimately this quality is what brought him much recognition in his teaching jobs.

I was always so proud that despite our difficult upbringing, Chris and I were functioning as strong adults; however, there have been many examples of late that one could relate back to our upbringing. I am now going through my second divorce. Chris is now in a situation I could never have dreamed possible.

As our family has been learning to grapple with Chris' punishment, I have to point out how many of us feel so strongly about his character and potential in life. We deeply love him and see him content as a grown up man some day. Since his incarceration, I've had many visits and talks with Chris. One of the things that never ceases to amaze me is that he is ALWAYS more concerned about how I'm doing than he is about how miserable his situation is. As I talk to him and hear screams in the background from other prisoners, as I watch him walk into the small visiting room with handcuffs and shackles, as I hear his voice and know he's scared yet he doesn't speak harshly, I am even more convinced than ever that he has matured in ways beyond expectations. He has not developed hatred; he's developed patience, empathy and strength of character. Since I'm the only family member in Houston, I believe I've experienced these characteristics more directly than anyone else in the family.

I truly believe that Chris has immense potential. He desires to do what's necessary, learn from it and become better for it. Again, although it would be easy for him to complain about his situation, he's always interested and concerned for others in the family. This trait continues to amaze me and leads me to realize how important it is for him to get into the best situation possible for the rest of his healing.

I've spent much of the time that Chris has been in jail wishing my Dad could take his place. My father's sick and twisted existence has affected both me and Chris in different but significant ways. That's not to say we're not responsible for our choices, only to point out that if