# United States District Court Southern District of Texas

## Case Number: ~~CR~~ H-05-78

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part __2__ of __2__

☐ Exhibit to: _____
  number(s) / letter(s) _____

Other: _____ Character & Support Letters

_____ & Various Documents for

_____ Sentencing

life were fair, my Dad would have served time long ago which means Chris might have been spared from living with the sick, abusive and manipulative upbringing we both had to endure. I'm learning that sometimes in life we have to learn to live with a lack of justice in certain ways. I just hope that Chris has an opportunity soon to move forward, not backward because he is absolutely worth it and if given the opportunity I feel we could trust that he would continue moving forward in his development.

Going back to that day many years ago when I was strolling Chris down the street as "my" baby, I feel an incredible desire to make sure everyone knows how special he is. I'm sure many family members have written words of support for their loved ones in jail, but I truly believe Chris is the exception to those in similar situations. He's ready to be given a better chance than he had from birth. With work, support from his family, a humble spirit and help from his higher power, he will have the same success I've now come to experience.

As I've gone through my own struggles over the years I have learned first hand how important getting the proper help can be. Through the right kind of abuse counseling, I have been able to come out the other end more confident, healthy and alive than I ever dreamed possible. I believe Chris deserves that chance before too much time goes by. I'm sure he'll be willing to do all the work necessary, just as I have done, to help himself.

I know Chris very, very well and I see his potential. If he is given the opportunity, I will be there to support his growth and because of my own success after years of turmoil, I can be a testament to the fact that if you're willing to do the work, you will have emotional success and happiness.

Please let me know if I can be of help in any way.

Sincerely,

Lisa Hopkins

Lisa Hopkins
Chris' sister
Home:  281-298-2515
Cell:  713-256-4373

Virginia Culin Roberts
10701 N. La Reserve Drive, Apt 245
Oro Valley, AZ  85737

2 |

June 26, 2005


TO WHOM IT MAY CONCERN:

RE: CHRISTOPHER JAMES WILLIAMS

Chris Williams is my grandson, child of my daughter Carol Scott (Williams) Russell and
James Williams.  I am aware of the charges against Chris and I know that he has entered a
guilty plea.  I have known Chris since he was just a few days old when I went to visit his
family which was living in Kansas City.  Chris has a sister, Lisa, who is almost nine years
older.  Chris spent his childhood in the Kansas City area.  When he was 12 years old, his
parents divorced and about a year later, he and his mother moved to Tucson, Arizona
(where I lived).  Chris completed 8th grade and high school in Tucson.  During that time, his
sister completed college at the University of Kansas and then married.  She remained in
Kansas City.

After graduating from high school, Chris attended the University of Kansas for several
semesters, then transferred to the University of Arizona, and finally completed his
education at the University of Houston because it offered the degree he was seeking in
sports administration.

During high school and college Chris maintained a high level of interest in sports.  He
played basketball in a league and coached several high school girls' basketball teams in
Tucson.  He served first as assistant varsity coach to his uncle, Jim Scott, and then as head
junior varsity coach at the same school.  Chris was enthusiastic, reliable and competent is
these roles.  He loved the job and he seemed to be well-liked by the girls and their parents.
My husband and I attended many of those games and can testify to his dependability.

While attending the University of Houston, Chris was hired part-time by the college
athletic department, and over a period of a few years he served in several different
capacities in the football program, including Assistant Director of Football Operations.  He
reported to the head football coach, who evidently valued his work since he eventually
hired him for a full time position, for which Chris interrupted his schooling for one year
before returning full time to finish his course work and graduate with a B.S. degree in
sports administration/kinesiology.

After graduating, Chris was highly recommended by a staff person in the UH athletic
department, and was subsequently hired to work as Director of Athletics, P.E. teacher and

coach at Holy Spirit Episcopal School in Houston. Five years later, he was hired by a prestigious private school, Alexander Dawson School, in Las Vegas to be their athletic director and football coach. My husband and I visited him there shortly thereafter. With great pride in the school itself and obvious enthusiasm for and dedication to the new job, he showed us around and introduced us to the school principal who spoke very highly of Chris. This was only weeks before his arrest in Las Vegas in December, 2004, his loss of the job and his subsequent imprisonment.

I believe now that when Chris accepted the new position and made the move to Las Vegas from Houston, he was embarking on a change of lifestyle, a new beginning in a favorable environment where he was obviously well-respected, and could leave past problems behind.

I have personally observed Chris to be an unusually fine person, honest, reliable, cheerful, helpful, cooperative and competent, with a great sense of humor. I consider him to be productive and capable of valuable contributions to society. He and I have corresponded during his imprisonment. His letters reveal a mature interest in national and international affairs, as well as a continuing interest in sports.

We sincerely hope that Chris will be given a chance, outside of prison, to live a productive life as a dependable member of society.

Sincerely,

*Virginia C. Roberts*

Virginia Culin Roberts

**RICHARD W. RUSSELL**
P.O. BOX 20633
WICKENBURG, AZ 85358  (928) 684-0319

June 21, 2005

To Whom It May Concern:

I am writing on behalf of Christopher Williams, and I am aware that he has been charged with and has pleaded guilty to receipt of child pornography.

I became acquainted with Chris a little over two years ago when Chris's mother Carol and I began dating.  Carol and I married two years ago this month.  My impressions and feelings are based upon the times Chris and I have had a chance to talk and discuss various topics, as well as on my observations of his attitudes and behavior.  Chris has managed to impress me very favorably with his attitude towards his family and friends, and his dedication to his profession. He appears to me to be very bright, well educated and a hard worker, as well as a loving and involved family member.

Chris has made a big mistake, and he knows it.  Is it a sickness or something he couldn't control at the time?  I don't know.  But I do not believe Chris to be mean or that he would in any way want to hurt someone.

Will he repeat this bad behavior in the future?  I don't know that either.  I do think Chris has had time to reflect upon his behavior and will deal with it by making different choices in the future. And he is going to need help from specialists in this field.  The sooner he can receive this help, the sooner he can become a productive citizen and make a contribution to society, which is what he wants to do.

Chris will receive love and support from his family and friends, especially his mother, Carol, who has been extraordinarily supportive and helpful to Chris during this ordeal.  She will continue to be so, and I will continue to support her efforts on Chris's behalf.  I believe that Chris's very strong, loving and highly moral family will provide the encouragement and support system he needs to resume a life in the outside world in the future.  He will not be alone.

Chris has made a grave mistake in his judgment and must pay for it.  What that amounts to, I leave to the courts.  But I have faith in Chris as a human being.  I believe he will sincerely try his very best and will succeed in the future.

A second chance, with the proper help, is what is needed to make Chris a productive citizen.

Sincerely yours,

Richard W. Russell

2483 South Scenic Drive
Salt Lake City, Utah 84109

June 28, 2005

Dick DeGuerin
1018 Preston Avenue
Houston, Texas 77002

Dear Dick DeGuerin:

I am writing this letter as a character witness for Christopher Williams. I am aware of the charges against him and that his plea is guilty.

Christopher and I know each other through marriage, his mother marrying my father. I work in a school setting very similar to the one Christopher worked in at the Alexander Dawson School of Rainbow Mountain in Las Vegas, Nevada. I had an opportunity to speak with the principal of the school during an accreditation team meeting at my school. She was so impressed with Christopher's professionalism in his job at the Dawson school. She mentioned that Christopher was outstanding in his position, worked very hard, and everyone at the school felt very lucky to have him working with their students.

In the time I have been around Christopher, I have known him to be a very gentle, caring, dedicated and good friend. My experience with Christopher tells me that he has superior qualities that make him a person who deserves consideration in his case. He has made a mistake that he wants to remediate as soon as he can. I feel Christopher deserves a chance at making positive contributions to society, and that he is anxious to get started on this task.

Respectfully,

Stephanie Jan Martin

July 14, 2005

Mr. Dick DeGuerin
1018 Preston, 7th Floor
Houston, TX
77002

Dear Mr. DeGuerin,

I am writing you in regard to my nephew, Chris Williams, who you represent in legal matters currently facing him.

I am aware of the charges facing Chris and their extremely serious nature. I believe that all of us are responsible for our own actions and must face the consequences of those actions, including Chris. I understand that Chris has pled guilty to at least some of those charges and now is about to face his consequences, at least in a legal sense.

Without in any way condoning wrongs Chris has done, I think it is important to also consider the person members of Chris's family knew and loved, still love. Chris has always been sensitive, loving and humorous. He's smart and he's thoughtful. He's responsible and he's caring. I believe those traits and characteristics—some innate, some learned—made him into the person who was voted Teacher of the Year while a teacher in Houston. He was known for, valued and loved for those same traits and characteristics within his family. That he was more than what we saw and knew—as we are all more than what other people know and see—is so very difficult because of the nature of those differences.

I correspond with Chris regularly. He is trying very hard to both stay grounded in the seriousness of the situation that faces him and also to stay positive about the possibility that he may be able to some day find a way to contribute to society. He reads whatever he can about current events and social / political issues. He thinks hard about those things and asks searching, insightful questions that have no easy answers. He is aware of the differences and the similarities he has with the other men in his current environment. Similarities in that they all stand accused. The differences that exist in their individual lives and circumstances leading to this point—yet here they all are in the same place. He is deeply struck by this.

I believe Chris is reaching out intellectually and personally, and at this point not shutting down and isolating himself. To me this means that, with help to deal with his own issues and after paying his debt to society, Chris can still do something positive with his life. I very much hope he will have the chance to do that.

Sincerely,

Marcia S. Hayes

Marcia S. Hayes
1 Pine Street, #2602
San Francisco, CA 94111

July 26, 2005

Dear Federal Judge:

I have been made aware of the charges that Chris Williams has pleaded guilty to in Federal Court. I would like to express my thoughts about Chris and the type of person he is.

I met Chris in the eighth grade, 18 ½ years ago, and we have been best friends ever since. Up through high school graduation we did everything together. Once we graduated and went to different colleges and beyond, we still stayed in touch and saw each other on a regular basis. While I haven't had the daily contact and interaction with Chris since high school, he has remained the same compassionate, driven and loyal person that I met so long ago.

I understand that the situation Chris is currently in is one of extreme consequences. However, I assure you that Chris is the type of person that will learn from this mistake and become an even better person because of it.

Sincerely,

Jason Boothe

July 1, 2005

Dear Federal Probation Officer,

My name is Corey Smith and I have been a friend of Chris's for about 8 years now. I am aware of the charges that Chris has plead guily to, but I wanted to take a minute to express my feelings about Chris. Chris and I became best friends beacause we were roommates together from July '98 until I got married in April '04. I believe if I hadn't got married and Chris didn't move to Las Vegas, Chris and I would still be living together.....that is how highly I think of him.

Chris is the most admirable and honest man that I have ever met in my life. I met Chris when we had a class at the University of Houston together. He befriended me when I was new to Houston and had no other friends in this town. His warmth and generosity stuck out that day because he offered to help me with anything that I needed. I was so nervous being in a big city without knowing a single person. Chris offered his friendship to me when nobody else would. I will ALWAYS be grateful to him for that. Thoughout the semester, we became really good friends and eventually became roommates. Numerous time we would go out to eat together after class and we attended many Houston Cougar football games together because we were both sports fanatics and he was just a pleasure to be around.

During Spring Break and summer vacation, we took many trips together. We went to Angel Fire, NM....Tucson, AZ....and most recently, we took a trip to Kansas City to see his beloved Royals play in the summer of 2003. I have never felt so secure around a person in all of my life. After knowing Chris only a few years, I asked Chris to be a groomsmen in my wedding.

I have never met a more straight-laced person in all of my life. Chris has the highest set of morals because he never did any kind of drugs, nor did he ever drink or smoke. He was also a man dedicated to his job because he loved helping kids. Nobody witnessed how much he loved his job more than me. He would work long hours at school and never complain about it. Even though he wasn't making much money, he would put in extra amount of time anyways. I would personally go to games and see how much the kids loved playing for him. He put his entire heart and soul into his job!!!!

I know Chris has made a mistake but nobody in this world deserves a second chance more than Chris. I know that Chris will turn this situation around and make a positive contribution to the world. I trusted Chris then and I still trust him now. Chris has been loyal to be throughout the last 8 years and my loyalty to him will never waiver. I know Chris has learned from his mistake and will never let it happen again.

Sincerely,

Corey Smith



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Institution*

*PO Box 1000*
*Butner NC 27509-1000*

## Sex Offender Treatment Program
(2003 revision)

### Description and Philosophy of the Program
The Sex Offender Treatment Program (SOTP) was established in 1990 at the Federal Correctional Institution (FCI) in Butner, North Carolina. The SOTP is an intensive, voluntary 112-bed residential therapeutic program for male sexual offenders in the Bureau of Prisons. The program employs a wide range of cognitive-behavioral and relapse prevention techniques to treat and manage sexual offenders. The primary goal of the SOTP is to help sexual offenders manage their sexual deviance in order to reduce sexual recidivism. The program adheres to the notion that, while there is probably no permanent cure for paraphilic disorders, criminal sexual behavior can be effectively managed in most cases through competent treatment and intensive supervision. Similarly, the SOTP adheres to the notion that, while sexually deviant disorders are influenced by biological, social and psychological factors, criminal sexual behavior is largely a volitional act.

The SOTP recognizes that sex offenders enter treatment with varying levels of denial and motivation. However, in managing limited resources for many sexual offenders in the Bureau of Prisons, the SOTP seeks to provide services to the most motivated and psychologically suitable offenders. Thus, the SOTP is designed to help individuals who want to help themselves and are committed to permanent behavioral change. The treatment program encourages its participants to change their criminal lifestyle and become honest, responsible and law-abiding citizens with effective self-control skills. The treatment program is task-based, not time-based. Progress is measured in terms of completion of treatment goals and maintenance of therapeutic gains. Length of time in the program, by itself, does not constitute therapeutic progress or accomplishment. Program participants do not "graduate" from the treatment program because treatment is viewed as a lifelong endeavor which must continue long after offender's release from prison.

### Admission Criteria
The SOTP seeks to select the most motivated, psychologically minded and treatment-appropriate inmates. The following criteria must be met before the inmate is considered for admission to the program:

1.    The inmate must have been convicted of a sexual crime. Inmates whose instant offense is not a sexual crime must have a documented history of sexually deviant and abusive behavior.

2.    The inmate must clearly volunteer for participation in the treatment program and demonstrate a commitment to behavioral change.

3.    The inmate must have a maximum of 36 months left on his sentence prior to release to the community, and a minimum of 18 months from the date of arrival to FCI Butner. Barring some exceptions, the treatment program is generally 18 months long and occurs at the end of the inmate's sentence. In cases where the inmate's release date is based on a parole date, the presumptive parole date will be used to determine his eligibility (i.e., 18-36 month from his release).

4.    The inmate does not have a pending charge or detainer which interferes with release to the community.  If the detainer or pending charge is relatively minor and likely not to result in a prison term or interfere with the inmate's release to the community, this criterion may be waived by the SOTP Director.

5.    The inmate speaks English, is literate and demonstrates sufficient intellectual ability to participate in psychotherapy.  The SOTP is not designed to meet the needs of intellectually challenged inmates. Borderline intellectual functioning and below renders the inmate ineligible to participate.

6.    The inmate is not psychotic and does not suffer from a psychiatric illness which would prevent him from participating in program.  He must demonstrate psychological stability and sufficient "ego strength" to endure the therapeutic intensity and rigors of the residential treatment program.

7.    The inmate may be denied admission to the program if there are indications of poor prognosis (e.g., psychopathy, chronic recidivism) or evidence of poor response to treatment in the past.

**The Residential Treatment Program**
The SOTP is currently housed in Maryland Unit, a general population housing unit of FCI Butner.  The residential program is not segregated from the general population.  Program participants have direct contact with general population inmates, as they use the same dining, educational, medical, recreational, and religious facilities.  Historically, inmates in the SOTP have experienced comparatively low levels of threat to personal safety.  Generally, they feel comfortable and are able to participate in therapeutic activities without imminent or significant danger to personal safety.

Program participants are expected to work as all general population inmates in the Bureau of Prisons, and encouraged to participate in activities and programs that promote personal growth and development outside of the SOTP (e.g., education, vocational training).

The length of treatment in the program varies depending on the length of the inmate's sentence, the date of referral to the program, the SOTP's waiting list, and date of arrival to FCI Butner.

The length of treatment may be as short at 18 months or as long as 36 months. Generally, admission to the program is granted in the last 18 months of the inmate's prison term. The SOTP is comprised of four essential components: orientation, assessment, treatment, and release planning:

Pre-treatment and Orientation: This component of the program orients the program participant to all aspects of the program and introduces him to the concepts of therapeutic community. Inmates participate in a brief series of orientation sessions about the program, the benefits of treatment, the expectations of staff and the standards of conduct for all program participants. In this phase, inmates attend and begin to participate in community meetings.

Psychosexual Assessment: This component consists of a series of questionnaires, psychological test batteries, and physiological assessment. Partipants are assessed in three domains: intelligence and cognitive functioning, personality and psychopathology, and psychosexual functioning. All participants will undergo plethymograph and polygraph examination.

Treatment: This component of the program is comprised of milieu therapy, psychotherapy in various treatment modalities, and participation in structured psycho-educational programs focusing on management of sexual deviance through skill building. Psychiatric treatment with medications may be considered on an individual basis to address symptom-related concerns. In addition to individually tailored goals, each program participant is expected to acquire and demonstrate:

1.    Remorse and guilt for the sexual crime(s) he committed
2.    Complete acceptance of responsibility for the sexual crime(s) he committed
3.    Recognition of his deviant sexual arousal and sexual offense pattern(s)
4.    Control and management of his deviant sexual arousal and behaviors
5.    Improvement in his ability to manage negative emotions
6.    Genuine empathy for his victim(s)
7.    Improvement in his social skills and overall interpersonal functioning
8.    Knowledge of relapse prevention skills

Treatment is implemented using the following modalities:

A.    Group psychotherapy
       Inmates are assigned to groups of approximately eight to ten program participants. Psychotherapy groups meet once or twice per week. Each group is led by doctoral level psychologists, master level therapists or pre-doctoral psychology interns. During group therapy, program participants are encouraged to honestly discuss their sexual offense history, behavioral patterns, thinking errors or cognitive distortions, difficulty empathizing with victims, and other personal issues. Program participants are encouraged to help each other by providing helpful and constructive feedback, support and confrontation.

B.  **Individual psychotherapy**
Inmates are assigned to a staff clinician for regular psychotherapy.  The goals of individual therapy are to guide the program participant in the process of treatment, implement specific cognitive-behavioral treatments and relapse prevention techniques, and address other individual concerns or symptoms.

C.  **Psychoeducational programs**
Inmates participate in weekly psychoeducational programs presented by the treatment staff.  The primary goal of this component of treatment is to develop or enhance specific skills required to maintain therapeutic gains and successfully achieve lifestyle change.  This component of the program is divided into three phases.  Each psychoeducational phase is 19 weeks long.  The entire psychoeducational component requires a minimum of 57 weeks to complete. SOTP participants receive programs on a variety of relevant subjects such as:

    a.  Relapse prevention
    b.  Communication and problem-solving skills
    c.  Management of stress and negative emotions
    d.  Victim empathy and victim impact
    e.  Management of deviant sexuality
    f.  Intimacy skills training
    g.  Family integration and reunification
    h.  Understanding thinking errors and distortions
    i.  Human sexuality and sexual orientation

D.  **Psychoeducational laboratory**
Inmates participate in weekly meetings to collectively discuss and complete homework assignments generated in their psychoeducational programs.

E.  **Community meetings**
Inmates participate in weekly community meetings designed to promote adherence to the standards of conduct and other behavioral norms.  These meetings are intended to provide information, allow program participants to publicly acknowledge and support one another, and an opportunity for the offender to re-affirm his commitment to a crime-free lifestyle.

F.  **Discussion groups**
Inmates participate in weekly group discussions focusing on treatment-related topics and reading assignments.

G.  **Anger Management groups**
Inmates participate in a weekly group to discuss their ongoing struggles and accomplishments with anger management.

H.     Release Planning groups
       Inmates approaching their release to the community meet to review and improve
       their relapse prevention plans, and discuss challenges of community reintegration
       and family reunification.

I.     Search of cells
       To promote accountability and personal responsibility, treatment staff routinely
       search the cells of program participants for the presence of contraband and other
       prohibited items.  Violations of BOP policies and the SOTP's Standards of
       Conduct result in disciplinary action and programmatic sanctions.

Release Planning:  This essential component of the program is intended to help program
participants maintain therapeutic gains and successfully achieve re-integration into the
community upon release from prison.  The SOTP staff and Unit Team collaborate to
develop a sound release plan for the program participant that includes appropriate post-
release housing, possible placement in Community Corrections Centers (CCC), as well as
recommendations for employment, community-based treatment, and community
supervision.  Program participants are encouraged to take an active role in planning their
release to the community.  Inmates requesting placement in a half-way house or CCC (for
up to 60 days) upon release from prison need to meet the following criteria at the time of
placement:

       a.     The inmate has successfully completed Phase I, II and III (Orientation,
              Evaluation and Treatment) and has participated in the SOTP for a
              minimum of 18 months

       b.     The inmate's risk of sexual or violent recidivism is judged to be low to
              moderate, and/or his risk of reoffense upon release is judged to be
              manageable with appropriate conditions of supervision and community
              containment

       c.     The inmate has signed a waiver to modify the conditions of community
              supervision with the sentencing court to incorporate all pertinent
              behavioral restrictions and follow-up treatment requirements imposed by
              the SOTP

       d.     The inmate has agreed to participate in an appropriate sex offender
              treatment or aftercare program in the community of re-entry

       e.     The inmate has demonstrated satisfactory institutional adjustment and
              participation in recommended correctional programs

Prior to the program participant's release from prison, the treatment staff prepare a
comprehensive discharge packet.  This packet is sent directly by the treatment staff to the
United States Probation Officer upon the inmate's discharge from the program.  The

discharge report contains risk-contingent recommendations regarding the intensity of community supervision and monitoring and generally address the areas specific to the offender's sexual deviance and risk (e.g., contact with minors, polygraph testing, treatment recommendations, employment restrictions, Internet restrictions, etc.).   The discharge packet is mailed to the USPO at least 30 days prior to the inmate's release or 45 days following him expulsion from the program. Risk prediction is implemented by integrating the scores from actuarial risk assessment instruments with clinical judgment. In compliance with Bureau of Prisons' policies, the sex offenders in the SOTP are referred to community-based sex offender programs upon their release, and they are subject to notification to state or local law enforcement and Sex Offender Registration officials in the district of release.

**The Staff**
The treatment staff is comprised of the following individuals:

> A. Hernandez, Psy.D., Program Director
> M. Bourke, Ph.D., Staff Psychologist/Polygraph Examiner
> L. Frazer, Psy.D., Staff Psychologist
> L. Demby, Ph.D., Staff Psychologist
> R. Melin, Psy.D., Staff Psychologist
> L. Baker, M.A., Treatment Specialist
> C. Gallop, M.A., Treatment Specialist/Plethysmograph Examiner
> R. Harmon, M.A., Treatment Specialist
> S. Taylor, B.S., Treatment Specialist/Referral Coordinator
> Pre-doctoral Psychology Interns

The treatment staff work closely with Unit Management staff to coordinate the inmate's program plan while incarcerated at FCI Butner, NC:

L. Sharpe, ACSW, Unit Manager
M. Phillips, Case Manager
P. McGilveary, Counselor

**Standards of Conduct**
Inmates in the SOTP are expected to adhere to higher standards of conduct in order to continue their good standing with the program.  This not only requires that program participants comply with all the rules and regulations governing inmate conduct as defined by the Federal Bureau of Prisons, but also adhere to standards of conduct consistent with individuals who are committed to permanent abstinence from deviant sexual behavior and from possessing any materials which could be used for these purposes (e.g., pornography).  Violation of BOP policy and/or SOTP Standards of Conduct or failure to achieve treatment goals may result in programmatic probation or immediate expulsion.  Expulsion from the program may result in institutional transfer and other consequences, as implemented by the inmate's Unit Team.  For more information about the Standards of Conduct, please see the SOTP Consent Form.

Dress Code

All SOTP participants must adhere to FCI Butner's Dress Code at all times. However, between the hours of 7:30 am and 4:00 pm on program days, the following are inappropriate: short pants, white or grey T-shirts, sweat pants, untucked shirts, soiled or unclean clothing, sunglasses, hats or any head gear, except for those worn for religious purposes, towels around neck, trouser leg turned up, radio headphones outside cells or shower shoes. Exceptions will be made when participants are moving to and from recreation areas during off-program hours.

Inappropriate Materials

Program participants must comply with all policies governing inmate conduct as defined by the Federal Bureau of Prisons. In addition to contraband, the following materials are considered inappropriate for program participants to use, posses, or manufacture any type of pornographic or sexually explicit material such as photographs, drawings, and written materials; any photograph or "cut-out" from any publication of a nude or partially nude adult or child; any sexual apparatus or paraphernalia; any publication or photograph depicting physical abuse or sexual violence; any obvious collection of photographs, pictures or drawings depicting any individuals in sexually explicit or suggestive poses or situations; any material that depicts, describes or encourages activities which may lead to violence, sexual crimes, or exploitation; and any other material that is viewed by staff as incongruent with the goals of treatment as defined by treatment staff.

General Rules

In addition to rules outlined by the Maryland Unit Team, program participants are also expected to adhere to the following rules: 1) participants should be fully dressed and well-groomed by 7:30 am on program days; 2) beds must be made by 7:30 am. – on program days, participants are expected to be out of bed after 7:30 am. – if not at their work site or approved institution program, participants are expected to be engaged in SOTP activities, cleaning their rooms, or contributing to the overall sanitation of the Maryland Unit; 3) prison-issued and personal clothing should be clean and in good condition (e.g., no holes or stains); 4) television should be off during program hours – television viewing is allowed as stipulated by the SOTP TV Guidelines posted in Maryland Unit; 5) playing cards, billiards, or other games are prohibited during work or program hours; and 6) telephone use is not allowed during work or program hours.

Visitation Guidelines

All visits with individuals who have not attained the age of 18 will be screened by treatment staff for their appropriateness. Treatment staff may restrict visitation with children if clinically indicated or if the offender is determined to pose a risk of harm to a child.

Confidentiality

Program participants are informed in writing of the limits of confidentiality, as defined by the Bureau of Prisons' Psychology Services Manual. Specifically, program participants are informed that their confidentiality is protected at all times, except in cases where there

is potential harm to self or others, when the security of the correctional institution is threatened, or when there is suspected child abuse. As BOP staff are charged with protecting every inmate's confidentiality as defined by policy, program participants are expected to protect the confidentiality and privacy of other inmates in the program.

**Referral Procedures**
The SOTP receives referrals from United States District Courts and institutions in the Federal Bureau of Prisons. All referrals to the SOTP must be submitted to the Director of the program for review and approval. Review of cases for admission to the SOTP will not be made prior to sentencing. If the inmate is determined to be appropriate for the program, the Director of the program will provide written acceptance to the referring office. Once accepted, the designation or re-designation request will be submitted to the appropriate regional designations administrator for review and action.

1.  *Direct commitment from a United States District Court*:  The Community Corrections Manager (CCM) will review available sentencing documents to determine eligibility. This may require additional contact with the US Probation Officer who completed the Pre-Sentence Investigation (PSI) report. Prior to preparing a "request for designation" (BP-337), the CCM will provide supporting documentation to the SOTP Director, recommending acceptance. If the Director of the SOTP determines that the inmate is eligible for the program, and bed space permits, the Director of the SOTP will prepare written acceptance to the CCM. The CCM will then initiate the request for designation, with comments verifying the SOTP Director's acceptance. If no other case management concerns exist, the respective regional designator will make the designation to "BUT SOTP". For initial commitment, the CCM will fax or mail a copy of the PSI, J&C and the Security and Custody Classification Sentry form indicating "months to release" or projected release date, and information regarding jail credit, pending charges or detainers.

2.  *Re-designation from Institutions of the Federal Bureau of Prisons*:  A referral packet must be submitted from the Unit Team or Chief Psychologist of the sending institution to the Director of the SOTP. A cover memorandum should outline the justification for the referral, with an assurance that the inmate has read a description of the SOTP and has consented to participate in all components of the program. Preliminary telephone contact between the Chief Psychologist at the referring facility and the Director of the SOTP is strongly encouraged to assess the inmate's suitability and eligibility, and to determine if there is available bed space. In addition to the cover memorandum, the referral packet must include the following:

    (i)    a memorandum from the Chief Psychologist (or designee) of the sending institution indicating that the inmate meets the admission criteria of the SOTP, is psychologically suitable for the rigors of sex offender treatment, and has sufficient motivation to complete the requirements of the program. Treatment contraindications should be highlighted and explained.

    (ii)   the Presentence Investigation report and Judgment & Commitment (J & C),

(iii)    copies of previous psychological and psychiatric evaluation and treatment reports

(iv)    a copy of a current progress report by the Case Manager

(v)    other pertinent collateral information (e.g., disciplinary history)

The SOTP Director will prepare a written response to the Chief Psychologist and/or Unit Team at the referring institution.  The Unit Team will prepare a re-designation request (Sentry form 409), noting the acceptance into the SOTP.  The respective regional designator will re-designate the inmate to "BUT SOTP" if no other case management concerns exist (transfer code 324).

**All inquiries should be directed to the SOTP Director or Designees:**

Andres E. Hernandez, Psy.D.        C.L. Frazer, Psy.D.        Sandria Taylor
(919) 575-4541 ext. 3672           ext. 3658                  ext. 3671
(919) 575-2017 facsimile
E-mail: aehernandez@bop.gov

<u>Removal from the SOTP</u>
If the inmate declines to participate in the required components of the SOTP, or is determined to be inappropriate for continued placement in the program, he will be expelled from the SOTP and be promptly removed from the treatment unit by the Unit Team.  The reason for removal will be documented in the Central File, and the inmate will be referred for return to his "parent facility" as a program failure (transfer code 325).



69 F.3d 723                                                                                      Page 1

69 F.3d 723
**(Cite as: 69 F.3d 723)**

▷
69 F.3d 723
Briefs and Other Related Documents

United States Court of Appeals,Fifth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Terry Burton KIMBROUGH, Defendant-Appellant.
**No. 94-10088.**

Nov. 9, 1995.
Rehearing Denied Dec. 28, 1995.

Following jury trial before the United States District
Court for the Northern District of Texas , Samuel
Ray Cummings, J., defendant was convicted of two
counts of receipt of child pornography and two
counts of possession of child pornography.
Defendant appealed his conviction and sentence.
The Court of Appeals , Prado, District Judge, sitting
by designation, held that: (1) execution of warrant
did not turn otherwise valid search into general one;
(2) two counts of indictment charging possession of
child pornography were multiplicitous; (3) refusal
to allow defendant to copy child pornography
seized as part of discovery process was not error;
(4) jury instructions adequately explained
government's burden of proving scienter with regard
to age of performers in pornography; and (5)
enhancements imposed upon sentencing under
guidelines were justified by evidence.

Affirmed in part and reversed in part.

Emilio M. Garza, Circuit Judge, filed opinion
concurring in part and dissenting in part.

West Headnotes

[1] Searches and Seizures 349 ⊶124
349k124 Most Cited Cases
Fourth Amendment prohibits issuance of general
warrants allowing officials to burrow through
person's possessions looking for any evidence of

crime. U.S.C.A. Const.Amend. 4.

[2] Searches and Seizures 349 ⊶124
349k124 Most Cited Cases
Warrant must particularly describe place to be
searched and person or things to be seized.
U.S.C.A. Const.Amend. 4.

[3] Searches and Seizures 349 ⊶125
349k125 Most Cited Cases
Test of whether specific warrant meets particularity
requirement of Fourth Amendment is whether a
prosecuting officer reading description in warrant
would reasonably know what items are to be seized.
U.S.C.A. Const.Amend. 4.

[4] Searches and Seizures 349 ⊶125
349k125 Most Cited Cases
In circumstances where detailed particularity is
impossible in warrant, generic language is
permissible if it particularizes types of items to be
seized. U.S.C.A. Const.Amend. 4.

[5] Searches and Seizures 349 ⊶125
349k125 Most Cited Cases
In cases where warrants seek to seize material
presumptively protected by Fourth Amendment,
level to which items to be seized must be
particularly described is heightened. U.S.C.A.
Const.Amend. 4.

[6] Obscenity 281 ⊶7.6
281k7.6 Most Cited Cases
Warrant authorizing seizure of materials related to
child pornography was particular enough to limit
officer's discretion; warrant properly limited
executing officers' discretion by informing them
what items were to be seized, including tapes,
cassettes, commercial software, hardware, disks,
CD ROMs, and other materials in addition to
magazines, photographs, and other visual depictions
or equipment used visually to depict minors
engaged in sexually explicit conduct. U.S.C.A.
Const.Amend. 6.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723                                                                                           Page 2

69 F.3d 723
**(Cite as: 69 F.3d 723)**

**[7] Criminal Law 110 ☞394.4(8)**
110k394.4(8) Most Cited Cases

**Searches and Seizures 349 ☞147.1**
349k147.1 Most Cited Cases
Blatant disregard by executing officers of language of search warrant can transform otherwise valid search into general one and thus mandate suppression of all evidence seized during search. U.S.C.A. Const.Amend. 4.

**[8] Obscenity 281 ☞7.6**
281k7.6 Most Cited Cases
Executing officers did not conduct overbroad search so as to invalidate otherwise valid warrant for search of materials related to child pornography, even though executing officers did not review each videotape, audio tape and document on premises to determine whether it was related to items they were authorized to seize by warrant. U.S.C.A. Const.Amend. 4.

**[9] Criminal Law 110 ☞1139**
110k1139 Most Cited Cases
Court of Appeals reviews district court rulings on multiplicity claims de novo.

**[10] Indictment and Information 210 ☞128**
210k128 Most Cited Cases
"Rule against multiplicity" prohibits government from charging single offense in several counts and is intended to prevent multiple punishments for same act. U.S.C.A. Const.Amend. 5.

**[11] Double Jeopardy 135H ☞29.1**
135Hk29.1 Most Cited Cases
For purposes of double jeopardy, defendant's sentences were not truly concurrent where separate mandatory special assessments were imposed for each count. U.S.C.A. Const.Amend. 5.

**[12] Double Jeopardy 135H ☞26**
135Hk26 Most Cited Cases

**Indictment and Information 210 ☞129(1)**
210k129(1) Most Cited Cases
Counts of indictment charging two violations of same statute prohibiting child pornography were multiplicitous and divided single offense into multiple offenses in violation of double jeopardy; both counts concerned conduct on or about same date and both involved possession of three or more items; only difference between charges was whether pictures or materials used to produce pictures traveled in commerce; plain language of statute's requirement that defendant possess "three or more" items indicated that Congress did not intend for statute to be used to charge multiple offenses. U.S.C.A. Const.Amend. 5 ; 18 U.S.C.A. § 2252(a)(4)(B).

**[13] Criminal Law 110 ☞1186.3**
110k1186.3 Most Cited Cases
Refusal to dismiss one of two multiplicitous counts charging defendant with possession of child pornography did not require reversal of defendant's entire conviction, which also included counts charging receipt of child pornography, given lack of factual evidence of potential juror confusion sufficient to rise to level of constitutional violation. U.S.C.A. Const.Amend. 5 ; 18 U.S.C.A. § 2252(a)(4)(B).

**[14] Criminal Law 110 ☞627.8(1)**
110k627.8(1) Most Cited Cases
Government's refusal to allow defendant to copy seized child pornography as part of discovery process did not violate discovery rule, since child pornography was illegal contraband. 18 U.S.C.A. § 2252(a)(4) ; V.T.C.A., Penal Code § 43.26 ; Fed.Rules Cr.Proc.Rule 16(a)(1)(C), 18 U.S.C.A.

**[15] Criminal Law 110 ☞627.8(1)**
110k627.8(1) Most Cited Cases
Government's offer to make seized child pornography available for inspection, but not to allow items to be copied was reasonable during discovery in prosecution for receipt and possession of child pornography; any prejudice or technical violation of discovery rules was insufficient to deprive defendant of constitutional rights. 18 U.S.C.A. § 2252(a)(4) ; V.T.C.A., Penal Code § 43.26 ; Fed.Rules Cr.Proc.Rule 16(a)(1)(C), 18 U.S.C.A.

**[16] Criminal Law 110 ☞1151**
110k1151 Most Cited Cases
Trial court's denial of continuances is reviewed for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723                                                                                          Page 3

69 F.3d 723
**(Cite as: 69 F.3d 723)**

abuse of discretion, viewed in light of all circumstances, and requires defendant to show serious prejudice.

**[17] Criminal Law 110 ☞590(1)**
110k590(1) Most Cited Cases
Defendant was not unfairly prejudiced by trial court's refusal to grant continuance after government limited his inspection of alleged items of child pornography removed from his residence to five-day period preceding trial; amount of material seized and length of government's review of material did not demonstrate prejudice or show that defendant had inadequate opportunity to prepare or to retain expert. 18 U.S.C.A. § 3161(h)(8)(B)(ii).

**[18] Criminal Law 110 ☞629(1)**
110k629(1) Most Cited Cases
Defendant was not unfairly prejudiced by admission of exhibits listed in government's expanded exhibit list, which added only two pieces of evidence, both of which were necessary for rebuttal of defendant's defense, and altered organization of remainder of items listed on previous exhibit list. 18 U.S.C.A. § 3161(h)(8)(B)(ii) ; U.S.S.G. § 2G2.2(b)(1) , 18 U.S.C.A.

**[19] Obscenity 281 ☞20**
281k20 Most Cited Cases
In prosecution for receipt and possession of child pornography, jury instructions properly charged scienter with regard to age of performers where jury was specifically instructed that defendant had to know at least one of persons depicted was minor; further instruction regarding age of performers would have been redundant and was not required. 18 U.S.C.A. § 2252(a)(2).

**[20] Criminal Law 110 ☞1139**
110k1139 Most Cited Cases

**Criminal Law 110 ☞1158(1)**
110k1158(1) Most Cited Cases
In examining sentence imposed, Court of Appeals reviews trial court's findings of fact for clear error and reviews purely legal conclusions or interpretations of meaning of guideline de novo.

**[21] Sentencing and Punishment 350H ☞732**

350Hk732 Most Cited Cases
(Formerly 281k18.1)
Evidence was sufficient to support district court determination that defendant intentionally ordered and possessed child pornography which depicted prepubescent minors or minors under age 12 and thus to support two-level increase under Sentencing Guidelines for receipt of such materials upon conviction of receipt and possession of child pornography. 18 U.S.C.A. § 2252(a)(2)(A), (a)(4)(B) ; U.S.S.G. § 2G2.2(b)(1) , 18 U.S.C.A.

**[22] Sentencing and Punishment 350H ☞698**
350Hk698 Most Cited Cases
(Formerly 281k18.1)
Evidence was sufficient, upon conviction of possession and receipt of child pornography, to support four-level increase under Sentencing Guidelines for ordering and possessing material portraying sadistic or masochistic conduct; two child pornography pictures admitted into evidence depicted female minor in bondage. U.S.S.G. § 2G2.2(b)(3) , 18 U.S.C.A.

**[23] Sentencing and Punishment 350H ☞304**
350Hk304 Most Cited Cases
(Formerly 110k986.2(1))
Sentencing court must be afforded wide discretion in sources of information it may consider.

**[24] Criminal Law 110 ☞1141(2)**
110k1141(2) Most Cited Cases
Defendant bore burden of demonstrating that information trial court relied on in electing to impose enhanced sentence under Sentencing Guidelines was materially untrue.

**[25] Sentencing and Punishment 350H ☞698**
350Hk698 Most Cited Cases
(Formerly 281k18.1)
Sentencing court was justified in relying on testimony of investigating agent and on presentence report and finding that five-level increase was warranted in sentence imposed on defendant for possessing and receiving child pornography based on alleged intent to distribute child pornography; agent found bulletin board system designed on defendant's computer which included closed files containing pornographic material depicting children

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723
**(Cite as: 69 F.3d 723)**

and advertisements for bulletin board which indicated that it was sexually oriented. U.S.S.G. § 2G2.2(b)(2) , 18 U.S.C.A.

[26] **Criminal Law 110 ⟲1186.1**
110k1186.1 Most Cited Cases
Cumulative error did not require reversal of defendant's convictions where, with exception of fact that two of four convictions were multiplicitous, there was no evidence that any cumulative effects prejudiced him.

*726 Arthur M. Schwartz, Bradley J. Reich, Denver, CO, for Appellant.
J. Robert Flores , Bruce Taylor , Dept. of Justice , Washington, DC, Tanya K. Northrup , Paul E. Coggins, U.S. Atty., Lubbock, TX, for Appellee.

Appeal from the United States District Court for the Northern District of Texas.

Before REAVLEY and EMILIO M. GARZA , Circuit Judges, and PRADO FN1, District Judge.

> FN1. District Judge of the Western District of Texas, sitting by designation.

PRADO, District Judge:
Terry Burton Kimbrough appeals his convictions for two counts under Title 18 U.S.C. Section 2252(a)(2) and 2 for receipt of child pornography and for two counts under Title 18 U.S.C. Section 2252(a)(4)(B) and 2 for possession of child pornography. For the following reasons, his conviction is affirmed in part and reversed in part.

### BACKGROUND

In 1992, the United States Customs Service (USSC) became aware of a computer bulletin board system (BBS) in Denmark known as BAMSE. USSC began to investigate BAMSE and discovered the BBS was involved in the international distribution of pornography, including child pornography, via computer. USSC also uncovered two additional Danish BBS's which included child pornography.

Subscribers to these BBS's can transport or " download" Graphic Interchange Format (GIF) files through modems attached to their computers. Once downloaded, the files can be viewed as pictures on the computer screen and they can be printed. Further investigation disclosed that a person identifying himself as Terry Kimbrough with the defendant's office address and phone number had downloaded two GIF files containing child pornography.

In February of 1993, USSC held a three-day briefing for its agents on its investigation, known as Operation Long Arm, into the illegal importation of child pornography from computer bulletin boards. The agents received training regarding the applicable law, technical methods for computer searches and seizures and evidence handling. After the training program, Agents Kemp Johnson and Eric Rembold commenced further investigation of Kimbrough and, based on the information uncovered, eventually applied for search warrants for Kimbrough's home and business in Abilene, Texas.

On March 4, 1993, agents executed search warrants for Kimbrough's residence and business. During the execution of the warrants, they seized a number of items including computers and computer related equipment, computer disks and accessories, videocassette and audio cassette tapes, magazines, receipts, ledgers, and various records. Among the seized materials were several depictions of child pornography primarily recovered from the computer equipment.

Kimbrough was indicted in Count 1 and Count 2 for knowingly receiving, by computer, a visual depiction, which had been transported in interstate commerce and the production of which involved the use of a minor engaging in sexually explicit conduct in violation of Title 18 U.S.C. Sections 2252(a)(2) and 2 ; in Count 3 of knowingly possessing three or more matters which contain visual depictions that had been shipped and transported in interstate and foreign commerce, the production of which involved the use of a minor engaging in sexually explicit conduct and which visual depictions were of such conduct in violation of Title 18 U.S.C.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723
**(Cite as: 69 F.3d 723)**

Sections 2252(a)(4)(B) and 2; in Count 4 of knowingly possessing three or more matters which contain visual depictions, produced using materials which had been transported by any means, including interstate and foreign *727 commerce, the production of which involved the use of a minor engaging in sexually explicit conduct and which visual depictions were of such conduct in violation of Title 18 U.S.C. Sections 2252(a)(4)(B) and 2 ; in Counts 5-7 of knowingly using a means of interstate commerce for the purpose of transporting obscene material in interstate commerce in violation of Title 18 U.S.C. Sections 1465 and 2 ; and in Count 8 of forfeiture pursuant to Title 18 U.S.C. Section 2253(a). The Government subsequently dropped Counts 5, 6 and 7. After a jury trial, Kimbrough was found guilty of Counts 1-4 and sentenced to a term of imprisonment of 72 months as to Counts 1 and 2 of the indictment and 60 months as to Counts 3 and 4, with all sentences to run concurrently.

### DISCUSSION

### Legality of Search and Seizure Issue

Kimbrough contends that the search warrants were unconstitutional on their face because, considering that many of the items were "presumptively protected speech," the warrants failed to sufficiently specify with particularity the items to be seized. The warrants sought seizure of

Tapes, cassettes, cartridges, streaming tape, commercial software and manuals, hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media-floppy disks, CD ROMs, tape systems and hard drive, other computer related operational equipment, and other similar materials in addition to, magazines, photographs, negatives, photographic slides, video cassette tapes or other visual depictions or equipment used to visually depict a minor engaging in sexually explicit conduct, and, bills, correspondence, receipts, ledgers, Postal receipts and telephone records all of which show orders

and deliveries to or from any known foreign or domestic distributor of child pornography.

[1] [2] [3] [4] [5] The Fourth Amendment prohibits issuance of general warrants allowing officials to burrow through a person's possessions looking for any evidence of a crime. *Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976). A warrant must particularly describe the place to be searched and the person or things to be seized. *Id.; United States v. Layne,* 43 F.3d 127, 132 (5th Cir.), *cert. denied,* 514 U.S. 1077, 115 S.Ct. 1722, 131 L.Ed.2d 580 (1995). In testing whether a specific warrant meets the particularity requirement, a court must inquire whether an executing officer reading the description in the warrant would reasonably know what items are to be seized. *Layne,* 43 F.3d at 132. In circumstances where detailed particularity is impossible, generic language is permissible if it particularizes the *types* of items to be seized. *Id.* In cases where warrants seek to seize material presumptively protected by the First Amendment, the level to which the items to be seized must be particularly described is heightened. *Marcus v. Search Warrant,* 367 U.S. 717, 731, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961).

[6] The warrants here are sufficiently particular to withstand Kimbrough's challenge. The language in the warrants properly limited the executing officers' discretion by informing them what items were to be seized. *See Layne,* 43 F.3d at 132-33 (holding that a warrant seeking "Child pornography; records of victims; drawings; pictures; computer disks; sexual devices; videotapes; child abuse books; magazines; audio tapes; and any other obscene or child pornographic material" was particular enough to limit the officer's discretion).

Kimbrough's reliance on cases involving obscenity is misplaced. FN2 The determination of which presumptively protected materials are obscene is a legal one and, therefore, not to be left to the discretion of the executing officers. Identification of visual depictions of minors engaging in sexually explicit conduct, in comparison, is a factual determination that *728 leaves little latitude to the officers. *See Id.; See also United States v. Hurt,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723
**(Cite as: 69 F.3d 723)**

808 F.2d 707, 708 (9th Cir.), *cert. denied,* 484 U.S. 816, 108 S.Ct. 69, 98 L.Ed.2d 33 (1987) ("Any rational adult person can recognize sexually explicit *conduct* engaged in by children under the age of 16 when he sees it.") (emphasis in original). We therefore find this contention to be without merit. FN3

> FN2. Kimbrough relies primarily on *Marcus v. Search Warrant,* 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961) ; *Stanford v. Texas,* 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) ; *Lo-Ji Sales v. New York,* 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979) ; and *Fort Wayne Books, Inc. v. Indiana,* 489 U.S. 46, 109 S.Ct. 916, 103 L.Ed.2d 34 (1989).

> FN3. Kimbrough's complaints regarding the broad seizure of his records and other papers are best addressed in the portion of this opinion focused on the execution of the warrants. The warrants' authorization for seizure of "bills, correspondence, receipts, ledgers, Postal receipts and telephone records all of which show orders and deliveries to or from any known foreign or domestic distributer of child pornography" are certainly sufficiently particular to withstand scrutiny. *See United States v. Layne,* 43 F.3d 127, 133 (5th Cir.1995) (finding that seizure of evidentiary materials does not implicate the First Amendment concerns implicated by seizures based on ideas); *United States v. Torch,* 609 F.2d 1088, 1090 (4th Cir.1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980) (finding a warrant for "records, documents and writings related to the transportation, sale and distribution in interstate commerce of lewd, lascivious and filthy films" to describe the things to be seized with sufficient particularity); *United States v. Jacobs,* 513 F.2d 564, 567 (9th Cir.1974) (finding a warrant for "certain documents pertaining to the interstate shipment of obscene materials" to survive

scrutiny).

Kimbrough further contends that, even assuming the warrants were valid, they were illegally executed. He argues that the law enforcement agents seized virtually every record, document and paper found at the premises, and confiscated every video and audio cassette tape. The Government denies that the search was overbroad. Specifically, the Government, through the testimony of Agent Johnson at the suppression hearing before the trial court, argues that the seizure of all video and audio tapes was necessary because the titles of such tapes were not dispositive of their content and that the absence or presence of child pornography in such items could not be determined by a cursory examination on the premises.

[7] Blatant disregard by executing officers of the language of a search warrant can transform an otherwise valid search into a general one and, thus, mandate suppression of all evidence seized during the search. *United States v. Rettig,* 589 F.2d 418, 423 (9th Cir.1978) ; *United States v. Medlin,* 842 F.2d 1194, 1199 (10th Cir.1988). The execution of a search warrant "must be one directed in good faith toward the objects specified in the warrant." *Gurleski v. United States,* 405 F.2d 253, 258 (5th Cir.1968), *cert. denied,* 395 U.S. 981, 89 S.Ct. 2140, 23 L.Ed.2d 769 (1969).

[8] Kimbrough has failed to meet his burden of proof in challenging the execution of the search warrants. *See United States v. Carhee,* 27 F.3d 1493, 1496 (10th Cir.1994) ; *United States v. Vigo,* 413 F.2d 691, 693 (5th Cir.1969). The fact that the executing officers chose not to review each video tape, audio tape and document on the premises does not make this search presumptively invalid. While the executing officers seized numerous documents that were later determined to be irrelevant to the case against Kimbrough, the record reflects significant numbers of documents were left at the scenes after an initial review showed them to be not within the scope of the warrants. Kimbrough has not directed our attention to specific examples of seized items that would demonstrate an absence of the executing officers' good faith belief that the items were described in the warrants. We find this

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723                                                                                                                    Page 7

69 F.3d 723
**(Cite as: 69 F.3d 723)**

argument to be without merit.

### Multiplicitous Counts Issue

[9] [10] Kimbrough contends that Counts 3 and 4 of the indictment against him are multiplicitous and should have been dismissed or the Government should have been required to elect a single count on which to proceed. FN4 We review trial court rulings on *729 multiplicity claims *de novo. United States v. Brechtel,* 997 F.2d 1108, 1112 (5th Cir.), *cert. denied,* 510 U.S. 1013, 114 S.Ct. 605, 126 L.Ed.2d 570 (1993). The rule against multiplicity stems from the 5th Amendment to the Constitution which forbids placing a defendant twice in jeopardy for one offense. The rule prohibits the Government from charging a single offense in several counts and is intended to prevent multiple punishments for the same act. *Id.; United States v. Heath,* 970 F.2d 1397, 1401 (5th Cir.1992), *cert. denied,* 507 U.S. 1004, 113 S.Ct. 1643, 123 L.Ed.2d 265 (1993) ; *United States v. Hurt,* 795 F.2d 765, 774 (9th Cir.1986), *amended on other grounds,* 808 F.2d 707 (9th Cir.), *cert. denied,* 484 U.S. 816, 108 S.Ct. 69, 98 L.Ed.2d 33 (1987). Kimbrough raised this challenge to the charges against him prior to trial by way of a motion to dismiss and at trial as part of his motion for judgment of acquittal. The trial court denied both requests.

> FN4. Count 3 charges Kimbrough with
> On or about March 4, 1993, ... knowingly possess[ing] three (3) or more matters which contain visual depictions that had been shipped and transported in interstate and foreign commerce by computer, the production of which involved the use of a minor engaging in sexually explicit conduct and which visual depictions were of such conduct, to wit, matters entitled:
> 'CHERRYA.GIF'
> 'CHERRYB.GIF'
> 'CHERRYC.GIF'
> 'WC221501.GIF'
> 'LITSIS.GIF'
> In violation of Title 18, United States Code, Section 2252(a)(4)(B) and 2.

> Count 4 charges Kimbrough with
> On or about March 4, 1993, ... knowingly possess[ing] three (3) or more matters which contain visual depictions which were produced using materials which had been transported, by any means, including interstate and foreign commerce, the production of which involved the use of a minor engaging in sexually explicit conduct and which visual depictions were of such conduct, to wit, matters entitled:
> 'MBON006.JPG'
> 'MBON007.JPG'
> 'DS-X-219.GIF'
> 'INNOCNT.JPC'
> 'KID013.GIF'
> In violation of Title 18, United States Code, Sections 2252(a)(4)(B) and 2.

[11] The Appellee first argues that the grouping of the offenses by the trial court under the Sentencing Guidelines removed the danger of multiple punishments. It contends that for "offenses that are to be grouped under U.S.S.G. § 3D1.2, the applicability of a single punishment prevents any Fifth or Eighth Amendment violations." This argument completely misstates applicable law. This Court has explicitly held that for double jeopardy purposes, sentences are not truly concurrent where a mandatory special assessment is separately imposed on each conviction. *United States v. Berry,* 977 F.2d 915, 920 (5th Cir.1992). Kimbrough's sentence included mandatory special assessments for each count. Furthermore, the Supreme Court precedent clearly holds that, for purposes of double jeopardy, a "separate conviction, apart from the concurrent sentence, has potential adverse ... consequences." *Ball v. United States,* 470 U.S. 856, 865, 105 S.Ct. 1668, 1673, 84 L.Ed.2d 740 (1985).

[12] The Appellee next argues that the materials that give rise to the two possession-based counts are different because the materials in Count 3 were themselves transported in interstate commerce while the materials referenced in Count 4 were produced using materials that had been transported in interstate commerce. The Appellee attempts to compare the separate counts here with counts

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723                                                                                                    Page 8

69 F.3d 723
**(Cite as: 69 F.3d 723)**

charging possession of separate drugs or weapons. However, each count charges possession of "three or more" items and, under the particular facts of this case, each of the items listed in counts 3 and 4 both traveled in commerce (via the computer) and was produced using materials that traveled in interstate or foreign commerce.

Both Counts 3 and 4 charge violations of the same statute on or about the same date and both involve possession of three or more items. The only difference between the charges relied on by the government in their brief is the jurisdictional element–whether the pictures or the materials used to produce them traveled in commerce. We find this distinction to be artificial and an unlawful attempt to divide a single offense into multiple offenses. FN5 *See* **\*730**Sanabria v. United States, 437 U.S. 54, 66 n. 20, 98 S.Ct. 2170, 2180 n. 20, 57 L.Ed.2d 43 (1978) ("A single offense should normally be charged in one count rather than several, even if different means of committing the offense are alleged.")

> FN5. We decline to employ the Appellee's suggestion that the charges in question pass the different-element test articulated in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). That test applies to determinations of whether Congress intended the same conduct to be punishable under two criminal provisions. By contrast, Counts 3 and 4 both charge a violation of the same criminal provision. *See Sanabria v. United States,* 437 U.S. 54, 70 n. 24, 98 S.Ct. 2170, 2182 n. 24, 57 L.Ed.2d 43 (1978). That criminal provision states, in relevant part,
> (B) [Any person who] knowingly possesses 3 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means

including by computer, if–
(I) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
(ii) such visual depiction is of such conduct;
shall be punished as provided in subsection (b) of this section.
Title 18 U.S.C. § 2252(a)(4)(B).

We must defer to the legislature's determination of whether a specific course of conduct constitutes one or more separate crimes. *Sanabria,* 437 U.S. at 70, 98 S.Ct. at 2182, 57 L.Ed.2d 43. In construing this statute, we look first to the plain language chosen by Congress. *United States v. Barlow,* 41 F.3d 935, 942 (5th Cir.1994), *cert. denied,* 514 U.S. 1030, 115 S.Ct. 1389, 131 L.Ed.2d 241 (1995). In this case, the plain language of the statute's requirement that a defendant possess "three or more" items indicates that the legislature did not intend for this statute to be used to charge multiple offenses. FN6 Furthermore, to the extent that the statute can be considered ambiguous, the rule of lenity requires us to resolve that ambiguity in favor of Kimbrough. *See United States v. Cooper,* 966 F.2d 936, 943 n. 11 (5th Cir.), *cert. denied,* 506 U.S. 980, 113 S.Ct. 481, 121 L.Ed.2d 386 (1992) ("When Congress fails to indicate the allowable unit of prosecution with clarity, doubt as to congressional intent should be resolved in favor of lenity for the accused.") We find that Counts 3 and 4 of Kimbrough's indictment are multiplicitous. *See Bell v. United States,* 349 U.S. 81, 84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955) (holding "if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses"). Therefore, the trial court should vacate Kimbrough's conviction on either of Counts 3 or 4. *See Heath,* 970 F.2d at 1402; *Brechtel,* 997 F.2d at 1112.

> FN6. It is this language that distinguishes the offense of possession of child pornography from the offenses of transporting and receiving child pornography for purposes of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

multiplicity argument. *Cf. United States v. Cipollone,* 951 F.2d 1057, 1058 (9th Cir.1991).

[13] Kimbrough further argues that his entire conviction should be reversed as he has been prejudiced by the multiplicitous indictment through the possibility that the repeated assertions of details regarding the two counts could have confused the jury by suggesting that several crimes were committed rather than one. We do not find that the trial court's refusal to dismiss one of the two counts requires reversal of Kimbrough's entire conviction.
The trial court charged the jury that, "Each count and the evidence pertaining to it should be considered separately." Kimbrough has not presented specific factual allegations of potential confusion. We find that Kimbrough has failed to demonstrate that any jury confusion was sufficient to rise to the level of a constitutional violation.

Access to Evidence Issues

Kimbrough next argues that the Government's refusal to allow him to copy the items of evidence charged in the indictment and in restricting his access to the evidence violated his constitutional rights to due process and effective assistance of counsel. On September 10, 1993, the trial court granted Kimbrough's motion for discovery to the extent that it requested information discoverable pursuant to Federal Rule of Criminal Procedure 16 and the lines of cases stemming from *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). The court ordered the government to "make discovery and give inspection " on or before September 17, 1993.

Kimbrough's motion had requested inspection and copying of the materials in question. Rule 16(a)(1)(C) provides in relevant part:
Upon request of the defendant the government shall permit the defendant to inspect *731 and copy or photograph books, papers, documents, photographs [and] tangible objects ... which are within the possession ... of the government ... and which are material to the preparation of the

defendant's defense or are intended for use by the government as evidence in chief at the trial, or were obtained from or belong to the defendant.
Fed.R.Civ.P. 16(a)(1)(C). Despite Kimbrough's requests and the language of Rule 16, the Government refused to allow Kimbrough to copy the charged items of child pornography. Kimbrough moved for dismissal of Counts 1-4 of the indictment based on the Government's refusal to allow copying. He also moved for a continuance and to designate the matter as a "complex case" pursuant to the Speedy Trial Act. *See* 18 U.S.C. § 3161(h)(8)(B)(ii). In response, the government offered to take the child pornography to Kimbrough's expert to save the expert the trip to San Angelo. The Government also offered to allow Kimbrough to examine the child pornography at the United States Customs Service office, the United States Attorney's office or defense counsel's office. The trial court denied Kimbrough's motions.

[14] [15] Child pornography is illegal contraband. *See* 18 U.S.C. § 2252(a)(4) ; Tex.Penal Code § 43.26 ; *New York v. Ferber,* 458 U.S. 747, 756-59, 102 S.Ct. 3348, 3354-55, 73 L.Ed.2d 1113 (1982). We decline to find that Rule 16 provides such contraband can be distributed to, or copied by, the defense. However, even if there was a Rule 16 violation, Kimbrough's argument fails. The Government's offer to make the materials available for inspection but not to allow them to be copied was reasonable. Furthermore, Kimbrough has failed to demonstrate that any actual prejudice arose from his inability to procure copies of the charged items. His conclusory assertion that the amount of material seized and the time it took the Government agents to review the material demonstrates he was precluded from having an adequate opportunity to review the material and obtain an expert for trial is simply insufficient. *See United States v. Cronic,* 466 U.S. 648, 663, 104 S.Ct. 2039, 2049, 80 L.Ed.2d 657 (1984) ("Neither the period of time that the Government spent investigating the case, nor the number of documents that its agents reviewed during that investigation, is necessarily relevant to the question whether a competent lawyer could prepare to defend the case in [the time available]. The Government's task of finding and assembling admissible evidence that will carry its

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723

69 F.3d 723
(Cite as: 69 F.3d 723)

Page 10

burden of proving guilt beyond a reasonable doubt is entirely different from the defendant's task in preparing to deny or rebut a criminal charge.") We find that any prejudice or technical violation of Rule 16 is insufficient to comprise a deprivation of Kimbrough's constitutional rights. We therefore find this contention to be without merit.

### Fair Trial Issues

[16] Kimbrough contends that he was denied a fair trial because he was refused an adequate opportunity to prepare for trial and because the District Court admitted numerous Government exhibits despite the Government having listed them as exhibits on the day of trial. A trial court's denial of a continuance is reviewed for abuse of discretion, viewed in light of all the circumstances, and requires a defendant to show serious prejudice. *United States v. Kelly*, 973 F.2d 1145, 1147-48 (5th Cir.1992) ; *United States v. Terrell*, 754 F.2d 1139, 1149 (5th Cir.), *cert. denied*, 472 U.S. 1029, 105 S.Ct. 3505, 87 L.Ed.2d 635 (1985).

[17] One month before trial, Kimbrough filed a motion pursuant to Title 18 U.S.C. Section 3161(h)(8)(B)(ii) requesting a continuance based in part on his counsel's desire to have access to the charged material. The following day, September 10, 1993, the Government sent Kimbrough's counsel a telefax indicating that the materials seized from Kimbrough's residence and business would be available for viewing the week of September 20th through the 24th of 1993. Kimbrough then filed a supplement to his motion for continuance arguing that the Government's "delay in making available to the defense all material in this case, [rendered] it impossible for [him] to be adequately prepared for trial by October 4, 1993." The trial *732 court denied both motions without elaboration.

On October 6, 1993, the Government tendered its exhibit list containing 20 exhibits. The morning of trial, the Government submitted an amended exhibit list containing more than 70 exhibits. Kimbrough objected on the record to the introduction of these new exhibits. The Government responded that the earlier exhibit list had included most of the exhibits

on the amended list and had merely not listed them individually. The Government noted that the remainder of the new exhibits were added in response to the defendant's exhibit list. The trial court found that the arguments were best taken up on an item-by-item basis as the exhibits were offered during the trial. Kimbrough made such objections as the trial progressed and the trial court overruled those objections.

Although we cannot condone unreasonable restriction of meaningful access to potential exhibits, Kimbrough has not shown the serious prejudice necessary to succeed on this argument. Any error, therefore, was harmless. Kimbrough's counsel was given two weeks notice of the week that the exhibits would be available for his inspection. As discussed above, Kimbrough's conclusory assertion that the amount of material seized and length of the Government's review of the material demonstrates prejudice is insufficient to succeed on this argument. *See Cronic*, 466 U.S. at 663, 104 S.Ct. at 2049, 80 L.Ed.2d 657. Kimbrough has failed to support his assertions that he was precluded from having an adequate opportunity to review the material or obtain an expert for trial. The nature of the defense raised-that the depictions had been altered and were not of actual children-would not require review of each document. Furthermore, while Kimbrough claims it was necessary for him to "consult with experts in the field of computer technology and pediatric and adolescent anatomy ... and interview potential witnesses involved in the Government's investigation," he has failed to show the connection between his failure to accomplish these tasks and the trial court's denial of his motions for continuance. Similarly, he argues it was necessary to "have an analysis conducted of the computer files seized" but fails to describe what type of analysis would have been done and what he expected the analysis would have demonstrated. On the facts and arguments before us, we are unable to say that the trial court's decision to deny Kimbrough's motions for continuance prevented him from receiving a fair trial. We therefore find this argument to be without merit.

[18] Kimbrough's argument regarding the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723                                                                                            Page 11

69 F.3d 723
(Cite as: 69 F.3d 723)

Government's amended exhibit list is similarly unconvincing. The Government contends that the expanded exhibit list added only two pieces of evidence, both of which were necessary for rebuttal of Kimbrough's defense. The Government contends that the remainder of the list merely specified which portions of the previously identified exhibits were to be introduced. Kimbrough, who bears the burden on this issue, has failed to rebut the government's assertion and an examination of the record supports the Government's contention. We find Kimbrough's assertion that he was unfairly prejudiced by the admission of exhibits listed in the Government's amended exhibit list to be meritless.

### Constitutionality of Title 18 U.S.C. Section 2252 Issues

Kimbrough contends that Title 18 U.S.C. Section 2252 is unconstitutional. He adopts the arguments of the Ninth Circuit holding the statute to be unconstitutional for lacking a scienter requirement for the age of minority. *See United States v. X-Citement Video, Inc.*, 982 F.2d 1285 (9th Cir.1992), *rev'd* 513 U.S. 64, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994). Since the briefing on the case at bar, the Supreme Court has held that Section 2252 passes constitutional scrutiny because the term " knowingly" in Section 2252(a)(1) and (a)(2) " extends to both the sexually explicit nature of the material and to the age of the performers." *United States v. X-Citement Video, Inc.*, --- U.S. ----, 115 S.Ct. 464, 472, 130 L.Ed.2d 372 (1994). Thus, Kimbrough's argument as to Counts 1 and 2 is without merit. Furthermore, as the language and composition of Section 2252(a)(4) parallels the language in *733Section 2252(a)(1) and (a)(2), Kimbrough's argument is without merit as to Counts 3 and 4 as well.

### Jury Instruction Issue

[19] Kimbrough contends that the jury instructions did not explain the Government's burden on proving the *mens rea* as to each element of the offenses. The Court instructed the jury:

  As to counts one and two, Title 18, United States

Code, Section 2252(a)(2), makes it a crime for any person to knowingly receive any visual depiction shipped or transported in foreign commerce by any means, including by computer, if the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct, and such visual depiction is of such conduct.
For you to find the defendant guilty of this crime, you must be convinced that the government has proved each of the following beyond a reasonable doubt:
First:  That the defendant knowingly received certain visual depictions;
Second:  That such visual depictions were shipped or transported in foreign commerce;
Third:  That such visual depictions were shipped or transported in foreign commerce by any means, including by computer;
Fourth:  That the production of such visual depictions involved the use of a minor engaging in sexually explicit conduct;
Fifth:  That such visual depictions are of minors engaged in sexually explicit conduct; and
Sixth:  That the defendant knew that at least one of the performers in such visual depictions was a minor.
The instructions as to counts three and four are substantially similar but substitute the possession language for the receiving language. Kimbrough argues that the Court should have instructed the jury that "it must find Defendant knew the producing of the depiction involved the actual use of a minor engaging in sexually explicit conduct."

As noted above, in *X-Citement Video, Inc.*, --- U.S. at ----, 115 S.Ct. at 472, the Supreme Court held that the term "knowingly" in Section 2252(a)(1) and (a)(2) "extends to both the sexually explicit nature of the material and to the age of the performers." *See also, United States v. Burian*, 19 F.3d 188, 191 (5th Cir.1994) (holding that Section 2252 requires " actual knowledge or reckless disregard of a performer's minority."). The trial court specifically instructed the jury that Kimbrough had to know at least one of the persons depicted was a minor. Further instruction regarding the age of the performers would have been redundant and is not required by the statute or the case law. Had the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723                                                                 Page 12

69 F.3d 723
**(Cite as: 69 F.3d 723)**

jury believed Kimbrough's defense-that the depictions had been altered and were not of actual children-they could have easily found so applying the instructions as given. The jury instructions properly charged scienter with regard to the age of the performers.

### Sentencing Guidelines Issues

[20] Kimbrough objects to three aspects of his Presentence Report ("PSR") and the resulting calculation of his sentencing guidelines. In examining the sentence imposed, we review the trial court's findings of fact for clear error and review purely legal conclusions or interpretations of the meaning of a guideline *de novo*. *United States v. Mejia-Orosco*, 867 F.2d 216, 221 (5th Cir.1989), *cert. denied*, 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989) ; *United States v. Dean*, 59 F.3d 1479, 1494 (5th Cir.1995). We review the trial court's determination "that conduct is relevant to the offense of conviction ... under a clearly erroneous standard." *United States v. Cockerham*, 919 F.2d 286, 289 (5th Cir.1990).

### A. Two Level Increase for Prepubescent Minor or Minors Under the Age of 12

[21] Kimbrough objected at sentencing to the increase for receiving materials involving prepubescent minors or minors under the age of 12. The PSR recommended this two-level increase under U.S.S.G. Section 2G2.2(b)(1). Kimbrough contends that the Government failed to produce any evidence to show that he intended to receive such materials.

At trial, United States Customs Office Agent Eric Rembold testified that a listing of a file entitled " BAM Young List" had been **\*734** retrieved from Kimbrough's office computer. On that list, file FAM03.GIF is described as "Eight Years Indian Girl" and file PPO4@.GIF includes the words " Preteen School Girl" in the description. Agent Rembold further testified that both FAM03.GIF and PPO4@.GIF were retrieved from computer disks obtained during the execution of the search warrants

and that both had been downloaded to Kimbrough's computer from BAMSE. We find that the trial court heard sufficient evidence, even apart from that contained in the PSR, to conclude that Kimbrough intentionally ordered and possessed child pornography which depicted prepubescent minors or minors under the age of 12, or, at the very least, had reckless disregard of the age of the performers. *See Burian*, 19 F.3d at 191. We therefore find no clear error in the two-level enhancement pursuant to U.S.S.G. Section 2G2.2(b)(1).

### B. Four Level Increase for Material Portraying Sadistic or Masochistic Conduct

[22] Kimbrough also objected at sentencing to the 4 level increase for material portraying sadistic or masochistic conduct or other violence. The PSR recommended this four-level increase under U.S.S.G. Section 2G2.2(b)(3). Kimbrough argues that the material involved in the counts of conviction did not portray such conduct and that, at any rate, there was no evidence that he intended to receive such material.

At trial, Agent Rembold testified that Kimbrough had downloaded file MBON006.JPG and file MBON007.JPG from the BAMSE. He further testified that Kimbrough's computer contained file descriptions of these two files: MBON006.JPG is described as "Bound and Gagged Spread in Chair" and MBON007.JPG is described as "Same Girl Almost Same Position." The PSR stated that "Two of the child pornography pictures admitted into evidence are those of a female minor in bondage. Adult pornography possessed by the defendant also displayed sado-masochistic acts." We find that the trial court heard sufficient evidence at trial to conclude that Kimbrough intentionally ordered and possessed pornography which depicted sadistic or masochistic conduct. We therefore find no clear error in the four-level enhancement pursuant to U.S.S.G. Section 2G2.2(b)(3). FN7

> FN7. Kimbrough objects to the use of adult pornography to enhance his sentence because private possession in the home of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723

69 F.3d 723
(Cite as: 69 F.3d 723)

Page 13

such materials is presumptively protected by the First Amendment. *See Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). We need not reach the question of whether such adult pornography can be considered for sentencing purposes as the child pornography admitted at trial provides sufficient basis to affirm the trial court's ruling.

C. Five Level Increase for Distribution of Obscene Material

Finally, Kimbrough objected at sentencing to the five-level increase for his purported intent to distribute child pornography. The PSR recommended this five-level increase under U.S.S.G. Section 2G2.2(b)(2). He argues that there was no evidence that he intended to distribute the material.

[23] [24] A sentencing court must be afforded wide discretion in the sources of information it may consider. *United States v. Schmeltzer,* 20 F.3d 610, 613 (5th Cir.), *cert. denied,* 513 U.S. 1041, 115 S.Ct. 634, 130 L.Ed.2d 540 (1994). Therefore, Kimbrough bears the burden of demonstrating that information the trial court relied on in sentencing is "materially untrue." *See United States v. Puig-Infante,* 19 F.3d 929, 943 (5th Cir.), *cert. denied,* 513 U.S. 864, 115 S.Ct. 180, 130 L.Ed.2d 115 (1994) ; *United States v. Flores,* 875 F.2d 1110, 1113 (5th Cir.1989).

[25] At sentencing, Agent Rembold testified that he recovered evidence from Kimbrough's office computer and a back-up tape which showed Kimbrough had set up his own bulletin board system named "Unbridled, Unlimited." A bulletin board system is designed to distribute and receive files. Agent Rembold testified that Kimbrough's bulletin board system included closed files containing pornographic material depicting children. Agent Rembold also testified that the search had uncovered advertisements for "Unbridled, Unlimited" which indicated that the bulletin board was a sexually oriented bulletin*735 board. Agent Rembold testified that he found no

evidence to show Kimbrough had actually engaged in a commercial distribution of the pornography.

Kimbrough offered no evidence to rebut Agent Rembold's testimony. Under these circumstances, the sentencing court was justified in relying on the testimony and on the PSR in finding that the five-level increase was warranted.

Cumulative Effect Issue

[26] Finally, Kimbrough argues that even if no single alleged impropriety rose to the level of reversible error, taken together, their cumulative impact so prejudiced him as to require reversal of his conviction. *See United States v. Diharce-Estrada,* 526 F.2d 637 (5th Cir.1976). We find, with the exception of Kimbrough's multiplicitous argument, Kimbrough's arguments to be without merit. Kimbrough's current argument merely restates arguments we have already rejected and completely fails to specify how the cumulative effects of these events prejudiced him. We therefore reject this argument.

CONCLUSION

We affirm the judgment of conviction regarding Counts One and Two. We reverse as to Counts Three and Four and remand for the trial court to vacate Kimbrough's conviction on either of those counts and to resentence Kimbrough if the trial court chooses to do so. AFFIRMED IN PART AND REVERSED IN PART.

EMILIO M. GARZA, Circuit Judge, concurring in part and dissenting in part:
Although I concur in most of the opinion of the Court, I dissent from Court's treatment of the "Multiplicitous Counts Issue." I am not convinced by the majority's statement that "[i]n this case, the statute's requirement that a defendant possess 'three or more' items would seem to indicate that the legislature did not intend for this statute to be used to charge multiple offenses." I believe the majority is reading too much into the "three or more" language.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723                                                      Page 14

69 F.3d 723
(Cite as: 69 F.3d 723)

Section 2252(a)(4)(B) states a crime of *possession,* with three alternative grounds for asserting jurisdiction under the Commerce Clause. Any person who
(B) knowingly possesses 3 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported in interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if-
such visual depictions involve child pornography, violates 18 U.S.C. § 2252(a)(4)(B). A conviction thus requires a showing that the defendant knowingly possessed 3 or more items depicting child pornography, and that each of these items also satisfies *one* of the alternative grounds for jurisdiction. The three items must each be shown to have *either* been "mailed," or "shipped or transported" in interstate commerce, or "produced" from an item that was mailed or so shipped or transported. The jurisdictional requirement does not change the basic nature of the item or the crime, which is *possession of child pornography.* The three alternative jurisdictional grounds merely allow a federal court to decide the underlying violation of possession, they do not alter what is being possessed.

I therefore agree with the majority that the jurisdictional difference between the two sets of items in Counts 3 and 4 is insufficient by itself to support separate counts. The Government could not, for example, plead the *same three items* in separate counts merely because the same three had been "shipped" in interstate commerce *and* " produced" using materials which had been mailed or so shipped. The key, rather, is whether the items are in fact distinct and different items, regardless of whether they were "mailed," "produced," or " shipped." FN1

FN1. The visual depictions referred to in the separate Counts 3 and 4 appear to be ten different items. That is, the depictions listed in Count 3-"CHERRYA.GIF", " CHERRYB.GIF", "CHERRYC.GIF", "

WC221501.GIF", and "LITSIS.GIF" -appear to be different depictions from those listed in Count 4-"MBON006.JPG", "MBON007.JPG", "DS-X-219.GIF", " INNOCNT.JPC", or "KID013.GIF". Accordingly, I believe the Government has not alleged the "same three items" in separate counts.

**\*736** While it may be true that "[a] single offense should normally be charged in one count rather than several, even if different means of committing the offense are alleged," *Sanabria v. United States,* 437 U.S. 54, 66 n. 20, 98 S.Ct. 2170, 2180 n. 20, 57 L.Ed.2d 43 (1978), we have held that the act of mailing three child-pornography photographs in separate envelopes may be punishable in three separate counts, even though the three photographs were mailed at the same time. *See United States v. Gallardo,* 915 F.2d 149, 151 (5th Cir.1990) ("With respect to the child pornography statute, each separate use of the mail to transport or ship child pornography should constitute a separate crime because it is the act of either *transporting or shipping* that is the central focus of this statute."). FN2 In the context of mail fraud, we have also held that "[e]ach separate use of the mail in furtherance of [a scheme to defraud] constitutes a separate crime." *United States v. Blankenship,* 746 F.2d 233, 236 (5th Cir.1984).

FN2. This language is quoted with approval in *United States v. Cipollone,* 951 F.2d 1057, 1058 (9th Cir.1991), cited by the majority in footnote 6.

The first two sections of the child pornography statute and the mail fraud statute speak of "*any visual depiction*" and "*any* scheme or artifice" (or " *any* counterfeit or spurious coin") respectively. " *Any* " is synonymous with "one or more." And we have held that a prosecutor has discretion to bring a single count or several counts where there is more than one item. Why should we read the phrase " *three or more* " in a more restrictive manner? Under the majority's interpretation of the statute, a prosecutor could only charge a defendant with one count under § 2252(a)(4)(B) whether he possessed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

69 F.3d 723
**(Cite as: 69 F.3d 723)**

three books or several thousand. FN3 I believe that some additional authority, in the form of legislative history or analogous case law, should be required before we assume that Congress intended to distinguish this section of the statute from the other sections by limiting the prosecutor's discretion to bring multiple counts. FN4

> FN3. My research has not uncovered any case that addresses the issue of multiple counts under this provision. In every case, the prosecution apparently chose to bring only one count under § 2252(a)(4)(B), even where, in one instance, the possession charge involved ten items. *See United States v. Burian,* 19 F.3d 188, 189-90 (5th Cir.1994) (defendant was in possession of ten video tapes received through the mails). If the prosecution has the discretion to bring a single count even where the facts would permit several counts, these cases do not tell us very much. In the present case, the Government apparently believed, mistakenly in my opinion, that it needed to rely on a jurisdictional distinction in order to bring more than one count.

> FN4. The legislative history contains no reference whatsoever to the language and purpose of § 2252(a)(4)(B). If Congress intended to remove prosecutorial discretion under this particular section of the statute, one would expect to find some reference to this limitation.

It is not obvious how Congress could have written this provision to make it clearer that multiple counts were permitted. It would have been confusing to omit the "or more" language from the "three" because this would seem to suggest that the possession of *four or more* items would *not* be a violation. The phrase "*at least* three" does not say anything different from "three or more." Nor do I believe that Congress's meaning would have been much clearer if they had stated "*any* three or more," even though this would have more closely paralleled the preceding provisions. FN5

> FN5. *Compare* 18 U.S.C. § 2252(a)(1) *and* § 2252(a)(2) *with* § 2252(a)(4)(B).

Therefore, it is more reasonable to assume that Congress simply wanted to heighten the evidentiary burden for convictions based on the mere possession of child pornography by requiring the Government to prove at least three items, but that Congress did not intend to eliminate the prosecutor's discretion to bring additional counts where there were *more* than three items, as long as each count is supported by three different and distinct items. The "or more" language affirms the prosecutorial discretion rather than removes it, by allowing the prosecutor to charge nine different items, for example, as one count or *737 as three. FN6 Accordingly, I do not believe that the "three or more" language indicates that Congress intended to eliminate the prosecutor's discretion to bring one or several counts under this particular provision of the statute. Counts 3 and 4 should be held sufficient not because they assert different jurisdictional grounds, but because they are supported by at least three separate and distinct items. I would therefore affirm as to both counts.

> FN6. Similarly, Congress would not have used the language "each three" because this might be read to remove prosecutorial discretion, requiring prosecutors to bring a separate count for each group of three items discovered in the defendant's possession.

C.A.5 (Tex.),1995.
U.S. v. Kimbrough
69 F.3d 723

Briefs and Other Related Documents (Back to top)

• 1994 WL 16058956 (Appellate Brief) Reply Brief of Appellant (Dec. 12, 1994)
• 1994 WL 16058955 (Appellate Brief) Opening Brief of Appellant (Aug. 1994)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Date of Printing: SEP 15,2005

## KEYCITE

▷ **U.S. v. Kimbrough, 69 F.3d 723 (5th Cir.(Tex.), Nov 09, 1995) (NO. 94-10088)**

### History
### Direct History

=>   1  **U.S. v. Kimbrough,** 69 F.3d 723 (5th Cir.(Tex.) Nov 09, 1995) (NO. 94-10088), rehearing denied (Dec 28, 1995)
        *Certiorari Denied by*
**H**  2  Kimbrough v. U.S., 517 U.S. 1157, 116 S.Ct. 1547, 134 L.Ed.2d 650, 64 USLW 3704, 64 USLW 3707 (U.S. Apr 22, 1996) (NO. 95-1564)

### Negative Citing References (U.S.A.)

*Disagreed With by*
▷    3  U.S. v. Richardson, 238 F.3d 837 (7th Cir.(Ill.) Jan 25, 2001) (NO. 99-4309) ★ ★ **HN: 22,25 (F.3d)**
**H**  4  Cervantes v. Cates, 206 Ariz. 178, 76 P.3d 449, 409 Ariz. Adv. Rep. 3 (Ariz.App. Div. 1 Sep 23, 2003) (NO. 1 CA-SA 03-0157), review denied (Mar 16, 2004) ★ ★ ★ **HN: 14,17 (F.3d)**
*Declined to Follow by*
**C**  5  U.S. v. Frabizio, 341 F.Supp.2d 47 (D.Mass. Oct 27, 2004) (NO. CRIM.03-10283-NG) ★ ★ ★ **HN: 14 (F.3d)**
*Declined to Extend by*
**C**  6  Arkansas Chronicle v. Easley, 321 F.Supp.2d 776 (E.D.Va. Jun 17, 2004) (NO. CIV.A. 1:04CV110) ★
*Distinguished by*
**H**  7  U.S. v. Snyder, 189 F.3d 640 (7th Cir.(Ill.) Sep 02, 1999) (NO. 98-2574) ★ ★ ★ **HN: 12,13 (F.3d)**
**C**  8  State v. Mather, 264 Neb. 182, 646 N.W.2d 605 (Neb. Jun 28, 2002) (NO. S-01-738) ★ ★ **HN: 12 (F.3d)**
▷    9  State v. Second Judicial Dist. Court ex rel. County of Washoe, 120 Nev. 254, 89 P.3d 663 (Nev. May 13, 2004) (NO. 42048) ★ ★ ★ **HN: 15 (F.3d)**
**C** 10  U.S. v. Hill, 322 F.Supp.2d 1081 (C.D.Cal. Jun 17, 2004) (NO. CR 02-01289 AK) ★ ★
     11  State v. Kandel, 2004 WL 1774781 (Minn.App. Aug 10, 2004) (NO. A04-266) ★ ★ ★ **HN: 14,15 (F.3d)**

### Court Documents
### Appellate Court Documents (U.S.A.)

**C.A.5 Appellate Briefs**
        .. UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Terry Burton KIMBROUGH, Defendant-Appellant., 1994 WL 16058955 (Appellate Brief) (C.A.5 Aug. 1994) **Opening Brief of Appellant** (NO. 94-10088)
        ORIGINAL IMAGE OF THIS DOCUMENT (PDF)
        .. UNITED STATES OF AMERICA, Plaintiff-Appellee, v. Terry Burton KIMBROUGH, Defendant-Appellant., 1994 WL 16058956 (Appellate Brief) (C.A.5 Dec. 12, 1994) **Reply Brief of Appellant** (NO. 94-10088)
        ORIGINAL IMAGE OF THIS DOCUMENT (PDF)

© Copyright 2005 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, ABN 64 058 914 668, or their Licensors. All rights reserved.